IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

KATHY L. WARREN            )
                           )
            Plaintiff,     )
                           )
      v.                   )   Case No. 07-4143-CV-C-REL-SSA
                           )
MICHAEL J. ASTRUE,         )
Commissioner               )
of Social Security,        )
                           )
            Defendant.     )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Kathy L. Warren seeks review of the final decision of the Commissioner of Social Security denying plaintiff's applications for disability insurance benefits and supplemental security income benefits based on disability. Plaintiff argues that the Administrative Law Judge ("ALJ") erred by not evaluating plaintiff's credibility properly, by not deferring to the opinion of her treating physician, and by not framing a proper hypothetical question for the vocational expert. I find that the ALJ did not err with respect to these matters; therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

This suit involves two applications made under the Social Security Act ("the Act"). The first is an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 et seq (Tr. 543-45). The second is an application

for supplemental security income benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq (Tr. 177-80). Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review to the same extent as the Commissioner's final determination under section 205.

Plaintiff's applications were denied (Tr. 108-15, 546-49). On November 22, 2002, following a hearing, an administrative law judge rendered a decision in which he found that plaintiff was not under a disability as defined in the Social Security Act (Tr. 123-37). On September 24, 2004, the Appeals Council of the Social Security Administration remanded plaintiff's case to the ALJ for further consideration (Tr. 167-70). After a supplemental hearing, the ALJ rendered a decision in which he found that plaintiff was not under a disability as defined in the Social Security Act (Tr. 15-29). On June 18, 2007, the Appeals Council denied plaintiff's request for review (Tr. 6-8). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

Plaintiff filed her application for SSI benefits on July 24, 2001 (Tr. 177-80). She stated that she was born in October 1962 and alleged that she became disabled beginning July 20, 2001 (Tr.

2

177).  In her disability report, plaintiff alleged disability due to fibromyalgia, arthritis in her hands, bilateral tendinitis, vertigo, migraine headaches, dizziness, depression, AV8[1] malformation of the brain, and memory loss (Tr. 199).

The general issues in a Social Security case are whether the final decision of the Commissioner is consistent with the Social Security Act, regulations, and applicable case law, and whether the findings of fact are supported by substantial evidence on the record as a whole.  The specific issues in this case are:

1.    Whether the ALJ performed a proper credibility assessment of plaintiff under the Polaski[2] factors;

2.    Whether the ALJ gave proper consideration to the opinion of plaintiff's treating physician, Janet Ahnemann, M.D.; and

3.    Whether the ALJ properly questioned the vocational expert based on the record.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g);

---

[1] I assume plaintiff means AVM, arteriovenous malformation.

[2] Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

3

Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v.
Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100
F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether
the Commissioner's decision is supported by substantial evidence
requires review of the entire record, considering the evidence in
support of and in opposition to the Commissioner's decision.
Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas
v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must
also take into consideration the weight of the evidence in the
record and apply a balancing test to evidence which is
contradictory."  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir.
1987) (citing Steadman v. Securities & Exchange Commission, 450
U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It
means such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion."  Richardson v. Perales, 402
U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th
Cir. 1991).  However, the substantial evidence standard
presupposes a zone of choice within which the decision makers can
go either way, without interference by the courts.  "[A]n
administrative decision is not subject to reversal merely because
substantial evidence would have supported an opposite decision."
Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

4

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 5 of 86

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.   THE RECORD

The record consists of the testimony of plaintiff, her husband, and her daughter along with the written responses from vocational expert John F. McGowan, Ed. D., and the documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

According to plaintiff's employment records, she earned the following income from 1978 through 2000:

6

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1978 | $ 1,146.86 | 1990 | $    668.80 |
| 1979 | 876.20 | 1991 | 4,103.02 |
| 1980 | 1,132.44 | 1992 | 667.38 |
| 1981 | 880.70 | 1993 | 190.13 |
| 1982 | 0.00 | 1994 | 136.00 |
| 1983 | 0.00 | 1995 | 0.00 |
| 1984 | 4,198.20 | 1996 | 414.00 |
| 1985 | 2,610.56 | 1997 | 11,314.18 |
| 1986 | 0.00 | 1998 | 16,298.65 |
| 1987 | 0.00 | 1999 | 13,854.54 |
| 1988 | 92.75 | 2000 | 299.60 |
| 1989 | 322.00 | | |

(Tr. 181).

In an undated claimant's statement, plaintiff reported her medications as including Prozac (antidepressant), Skelaxin (muscle relaxer), Imitrex (for migraines), Ranitidine (reduces stomach acid), Triamterene/HCTZ (diuretic), Verapamil[3], Meclizine[4], OxyContin (narcotic), and Trazodone (antidepressant) (Tr. 214).

On August 1, 2001, plaintiff completed an application for supplemental security income (Tr. 177-80).  In that application,

_____

[3]A calcium channel blocker.  Treats high blood pressure, chest pain, and irregular heart beats.

[4]An antihistamine.  Treats nausea, vomiting, and dizziness associated with motion sickness; also treats vertigo.

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 7 of 86

plaintiff stated that she has been disabled since July 20, 2001 (Tr. 177). Plaintiff listed two vehicles and her only assets; she indicated that she receives food stamps and that her husband receives about $1,000.00 monthly from Social Security (Tr. 178-179).

On August 1, 2001, plaintiff completed an application for disability insurance benefits (Tr. 543-45). In that application, plaintiff represented that she became unable to work due to her disabilities on June 28, 2001 (Tr. 543). She listed her three children as being eligible for Social Security benefits (Tr. 544).

On August 8, 2001, plaintiff completed a disability report (Tr. 198-207). In that report, plaintiff indicated that her illnesses include fibromyalgia[5], arthritis[6], tendinitis[7], vertigo[8], migraines, dizziness, depression, a malformation on brain, and memory loss (Tr. 199). Plaintiff stated that her

---

[5]Fibromyalgia is a chronic condition characterized by widespread pain in the muscles, ligaments and tendons, as well as fatigue and multiple tender points — places on the body where slight pressure causes pain.

[6]Arthritis is the breakdown of joint cartilage.

[7]Tendinitis is inflammation or irritation of a tendon.

[8]Vertigo is the feeling that you or your environment is moving or spinning. It differs from dizziness in that vertigo describes an illusion of movement. When you feel as if you yourself are moving, it is called subjective vertigo, and the perception that your surroundings are moving is called objective vertigo.

8

medical conditions result in pain all over, swelling in her hands and feet, memory loss, and depression (Tr. 199). Her medical conditions allegedly began on January 1, 1998, and she became unable to work on November 5, 1999 (Tr. 199). Plaintiff reported the following medical tests performed in 2001: EKG, breathing test, ex-rays of hip and knees, and MRI/CT scan of her brain (Tr. 204). She reported receiving no vocational rehabilitation to return to work (Tr. 205).

On September 10, 2001, plaintiff completed a claimant questionnaire (Tr. 223-27). In that document, plaintiff reported that her symptoms include migraines; loss of focus and concentration; memory problems; ringing in her ears; depression; painful and swollen hands and feet; pain in her back, hips, and shoulders; pain like a heart attack; and weakness in her wrists (Tr. 223). These conditions worsen with changes in the weather and any kind of activity (Tr. 223). She has these symptoms "all the time" and nothing relieves them (Tr. 223). According to plaintiff, she does almost nothing because of the pain, is unable to sleep, cannot focus or concentrate, and becomes irritable and short tempered with her family and friends (Tr. 224-26). She concluded with this statement: "I used to be a very hard working person and now that I can't work I get depressed and feel very lazy" (Tr. 226).

9

On September 16, 2001, plaintiff's husband completed a daily activities questionnaire in which he reported that plaintiff has been in pain most of the time since November 1999, she gets light-headed and stumbles around, falls down a lot, and experiences symptoms of a heart attack (Tr. 228). He indicated that plaintiff's condition worsens with changes in the weather (e.g. heat, cold, rain, and snow) (Tr. 228).

On September 23, 2002, plaintiff completed a claimant's current medication form in which she represented that she takes the following medication for the condition indicated:

| | |
|---|---|
| Prozac | Depression |
| Triamterene | Water pill |
| Verapamil | Blood pressure |
| Meclizine | Dizziness |
| OxyContin | Pain |
| Trazodone | Sleep |
| Klonopin | Muscle relaxer[9] |
| Prevacid | Stomach |
| Zyprexa | Sleep |
| Baclofen | Muscle relaxer |
| Loradol | Headache pain |
| Claritin | Sinuses |

---

[9]Klonopin is not a muscle relaxer. It is a benzodiazapine which treats seizures and symptoms of panic disorder.

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 10 of 86

|                              |                   |
| ---------------------------- | ----------------- |
| Hydrocortisone               | Cracking hands    |
| Clotrimazole/Betamethazone   | Mouth sores       |

(Tr. 232-33).

**B.    *SUMMARY OF MEDICAL RECORDS***

On August 22, 1989, plaintiff went to Truman Medical Center East for a follow-up visit on her hypertension (Tr. 260). She reported that she was still not drinking caffeinated beverages and was avoiding salt, but continued to smoke (Tr. 260). Plaintiff had a swollen ankle from playing softball, which was diagnosed and treated as a sprain (Tr. 260).

On September 12, 1989, plaintiff was seen at Truman Medical Center after being hit on the head with a metal tabletop, which resulted in injury to her face (Tr. 262).

On September 8, 1990, plaintiff went to Truman Medical Center East for a follow-up on her hypertension (Tr. 263). Plaintiff reported that she continued exercising and avoiding caffeine, but was still smoking (Tr. 263).

On December 13, 1991, plaintiff went to Truman Medical Center East with hypertension, urgency (i.e., blood pressure 200/130), and she was treated and released the next day (Tr. 275).

On December 14, 1991, plaintiff had a chest x-ray at Truman Medical Center East which showed that her lungs and heart were normal (Tr. 277).

11

On April 4, 1992, plaintiff was seen at Truman Medical Center East for her hypertension and received a refill on her prescriptions (Tr. 279).

On January 6, 1993, plaintiff was seen at Truman Medical Center for pain in her shoulder, which was diagnosed as spasm and treated with medication (Tr. 281).

On March 23, 1993, plaintiff returned to Truman Medical Center East complaining about pain in her shoulder, and she was assessed as having muscle spasm and abusing tobacco (Tr. 283).

On August 6, 1993, plaintiff went to Truman Medical Center complaining of bronchitis, and she reported having stopped smoking (Tr. 286).

On April 17, 1994, plaintiff returned to Truman Medical Center complaining about stomach pain (Tr. 289). In the social history, plaintiff reported that she was single, had four children, had one sexual partner for the past five years, was unemployed and on Medicaid, smoked tobacco, had used marijuana in the past, and occasionally drank a beer (Tr. 289). The impression was threatened abortion,[10] and the plan included bed rest, follow-up with family clinic, collecting passed tissue, and taking prescribed medication (Tr. 290).

---

[10]Threatened abortion is a condition that suggests a miscarriage might take place before the 20th week of pregnancy.

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 12 of 86

On July 25, 1994, plaintiff went to Truman Medical Center East with a dislocated elbow caused when she fell off a skateboard, and she was sent to Truman Medical Center West for treatment (Tr. 294-95).

On July 27, 1994, plaintiff returned to Truman Medical Center East complaining about pain in her elbow, and she was given medication and directed to an orthopedic clinic the next day (Tr. 296).

On July 28, 1994, plaintiff returned to Truman Medical Center East for x-rays which showed a dislocated elbow in excellent position and without evidence of fracture (Tr. 297).

On February 17, 1995, plaintiff went to Truman Medical Center East complaining of body aches and malaise, and she was treated (Tr. 298).

On May 25, 1995, at 32 years of age, plaintiff went to Truman Medical Center East complaining of anxiety (Tr. 299). She reported that she was having difficulty at home and at her work (Tr. 299). She stated that she was stressed, cried a lot, was sleepless, and was upset that her children were staying with their grandparents (Tr. 299). Plaintiff was assessed with anxiety, treated, and released (Tr. 299).

On December 29, 1995, at age 33, plaintiff went to Truman Medical Center East very upset and sleepless because her parents were trying to take her children away from her (Tr. 300).

13

On January 15, 1996, plaintiff, then age 33, went to Truman Medical Center East complaining of anxiety and sleeplessness arising from a child custody dispute (Tr. 302). There is some reference to a "work up has been done - i.e., fibromyalgia" (Tr. 302). Plaintiff was prescribed medication for her other complaints (Tr. 302).

On November 18, 1996, plaintiff went to Truman Medical Center East complaining of anxiety and sleeplessness related to the child-custody dispute (Tr. 303). Plaintiff declined psychiatric consult and was started on Paxil[11] and Ambien[12] (Tr. 303). The doctor discussed good sleeping and hygiene habits and use of diaphragmatic breathing for relaxation (Tr. 303). Plaintiff was smoking about one pack of cigarettes per day (Tr. 303).

On December 9, 1996, plaintiff went to the Wetzel Clinic complaining about pain across her upper back that was diagnosed as muscle spasm (Tr. 316).

On August 18, 1997, plaintiff went to Truman Medical Center East complaining of an injury from a fall, i.e., a head contusion and neck pain (Tr. 305). She was given medication and told to rest and put ice on the injury (Tr. 305). X-ray examination of her spine came back normal (Tr. 306).

---

[11]Paxil is prescribed for major depression.

[12]Ambien is prescribed for sleeplessness.

14

On November 3, 1997, plaintiff went to the emergency room at Truman Medical Center East complaining about headache for four days, nausea, vomiting, pain, dizziness, and photophobia[13] (Tr. 307). She was examined, given medication and instructed to return to the clinic for a follow-up visit (Tr. 307).

On March 24, 1998, plaintiff went to Independence Family Medicine, Inc., for blood pressure check and complaints of sleeplessness, not eating well, and headaches (Tr. 344). She was diagnosed with depression/anxiety and hypertension (Tr. 344).

On April 2, 1998, plaintiff returned to Independence Family Medicine, Inc., complaining that she was still experiencing problems because she had her children taken away from her about two years earlier and was involved in a custody battle (Tr. 345). Examination was essentially normal, and plaintiff was diagnosed with depression and hypertension (Tr. 345).

On June 15, 1998, plaintiff returned to Independence Family Medicine, Inc., complaining about abdominal pain (Tr. 345). The examination was normal so plaintiff was referred for an abdominal ultrasound, which proved negative (Tr. 345-46).

On June 18, 1998, plaintiff was seen by an occupational medicine doctor concerning a problem with her shoulder, which proved to be a strain (Tr. 350-51).

---

[13]Photophobia is eye discomfort in bright light.

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 15 of 86

On December 16, 1998, plaintiff underwent a laparoscopic cholecystectomy (i.e., gallbladder removal) at Bothwell Regional Health Center (Tr. 397). At the time, she was smoking a pack of cigarettes a day (Tr. 397). She was discharged in good condition with an excellent prognosis (Tr. 398-402).

On October 6, 1998, plaintiff dropped a concrete lid on her toe, was treated by an occupational medicine doctor, and returned to work (Tr. 354-64).

On May 26, 1999, plaintiff injured her right arm while pulling out a bio filter, and was returned to work (Tr. 365-66).

On June 16, 1999, plaintiff went to the Osage Valley Medical Center complaining of stress and seeking a note to excuse her from work because of her pending custody battle (Tr. 377). She was encouraged to work, exercise, and seek counseling (Tr. 377). Plaintiff also complained of muscle spasms in her back (Tr. 377).

On August 28, 1999, plaintiff went to Bothwell Regional Health Center for a headache, was examined without showing anything abnormal or positive, and was given pain medication (Tr. 405).

On September 21, 1999, plaintiff's back was injured lifting a station lid and she was placed on light work (Tr. 367-69). She was diagnosed with mild low back strain (Tr. 370).

On February 2, 2000, plaintiff went to Truman Lake Clinic. Physical examination revealed point tenderness over both shoulder

joints and her elbows; and she had point tenderness in the small distal joints of both hands. Her diagnoses included chronic polyarthritis[14] and migraine cephalgia[15] (Tr. 380).

On February 3, 2000, examination of plaintiff's lumbar spine showed no acute parenchymal process and no localizing abdominal abnormality (Tr. 385).

On February 15, 2000, plaintiff returned to Truman Lake Clinic and reported that her pain was at times intolerable. Physical examination revealed tenderness on her major muscle groups in the deltoid gluteus and upper and lower extremities peripherally. She was tender at T6, T7, and T8 in the midline primarily. Her doctor diagnosed polyarthralgia and polymyalgias[16], and prescribed Verapamil[17], Prozac (antidepressant), Darvon (narcotic), Prevacid (for stomach acid), and Flexeril (muscle relaxer) (Tr. 381).

On February 22, 2000, plaintiff reported continuing pain as well as pain in her feet. Her doctor ordered a rheumatology consultation. (Tr. 382).

---

[14]Chronic polyarthritis is a chronic, autoimmune disease, that attacks the body's synovial membranes and joints. It is also called rheumatoid arthritis.

[15]Migraine cephalgia means migraine headache.

[16]Pain in several muscle groups.

[17]A calcium channel blocker. Treats high blood pressure, chest pain, and irregular heart beats.

17

On March 15, 2000, plaintiff went to University Hospital &
Clinics for evaluation of pain.  Plaintiff reported she hurt in
all her joints and muscles.  She described pain in her back,
hips, and shoulders that would wake her from sleep.  Physical
examination revealed good range of motion in her shoulders and
elbows, although movement was painful.  Spine x-rays were normal
(Tr. 413-15).  There is a note in the material that is presumably
from Dr. Folenlogen that reads: "Have seen [and] evaluated pt.
She has diagnosis of fibromyalgia [unintelligible] possible
sacroiliitis [and] [decreasing] Schobers"[18] (Tr. 414).[19]

On March 22, 2000, plaintiff went to Truman Lake Clinic
complaining about headaches and pain in her feet, but she denied
muscle aches and pains (Tr. 383).  She requested Darvon but the
doctor refused given its "addictive nature" (Tr. 383).  Plaintiff
was assessed with hypertension, anxiety, depression, generalized

---

[18]Sacroiliitis is an inflammation of the sacroiliac joint,
and Schober's test is a test used in rheumatology to measure the
patient's ability to flex his or her lower back.

[19]It seems that the doctor here is simply recording what the
patient has told him or her, not making a diagnosis.  I make this
observation because the notes above this entry show the doctor's
assessment, which does not include "fibromyalgia" (Tr. 414).  I
also note that on January 15, 1996, plaintiff reported a similar
diagnosis to the doctor at Truman Medical Center (i.e., "work up
has been done – i.e., fibromyalgia)[,]" which underlying document
is not in the record (Tr. 302).  Nevertheless, I acknowledge that
this diagnosis of fibromyalgia was subsequently picked up by the
University of Missouri Hospitals and Clinic, despite the fact
that plaintiff reacted positively even to control points during
her examination (Tr. 416).  Patients with fibromyalgia should not
react positively to control points.

18

myalgias, polyarthralgia, polyarthritis - unknown cause, rheumatology consultation pending, and folliculitis on her left leg (Tr. 383).

On April 27, 2000, plaintiff went to Truman Medical Center East reporting a headache for the past three days. Tylenol did not help and Ibuprofen upset her stomach. She denied visual changes and nausea. Plaintiff reported a history of high blood pressure, anxiety, depression, and stated that she smoked about a pack of cigarettes per day (Tr. 308). Plaintiff represented that she had been told that she may have fibromyalgia (Tr. 308). The examining doctor diagnosed a probable tension headache with normal neurological exam. The doctor gave plaintiff an injection of Toradol, and prescribed Lodine (non-steroidal anti-inflammatory) and Flexeril (muscle relaxer) (Tr. 308).

On May 30, 2000, plaintiff returned to University Hospital & Clinics Immunology and Rheumatology Clinic for a follow-up visit. Eric Greidinger, M.D., examined plaintiff and noted good range of movement in both upper and lower extremities with no synovitis[20], joint swelling, or tenderness noted. She had tender points for fibromyalgia, but she also had tenderness in control points like the arms and legs. Dr. Greidinger diagnosed fibromyalgia syndrome, chronic pain syndrome, and depression. He prescribed Ultram (narcotic-like pain reliever) and Flexeril (muscle

---

[20]Inflammation of a joint-lining membrane.

19

relaxer), and advised plaintiff that physical therapy and
hydrotherapy could be helpful with her diagnoses.  The doctor
also instructed plaintiff to get a psychiatric consult as she was
very tearful during her examination (Tr. 416-17).

On June 22, 2000, plaintiff, now 38 years old, went to Mark
Jarek, M.D., for evaluation of diffuse musculoskeletal pain.  The
notes states that "[s]he was seen by a rheumatologist at Columbia
in May of this year with no records available though it was told
she had fibromyalgia.  She does not recall any blood work or
diagnostic studies being performed at that time.  For the most
part she denies joint swelling, warmth, or erythema[21] except for
occasional hand or ankle swelling" (Tr. 419).  Plaintiff reported
she had experienced head-to-toe pain for the last three years,
increasing for the last year.  Flexeril had not helped and Ultram
caused nausea.  She said she enjoyed painting and fishing, but
was not doing much recently.  The notes also state that "[s]he
has not tried physical therapy or massage.  She has tried
chiropractic in the past without benefit" (Tr. 419).  She had
been working in a flower shop two times a week earlier in the
year, but she said she had to discontinue that employment due to
severe pain.  Plaintiff reported that she was smoking a half a
pack of cigarettes per day (Tr. 419).  Physical examination
revealed good range of motion without appreciable synovitis

---

[21]Redness due to capillary dilation.

20

(inflammation of a joint-lining membrane). Plaintiff had diffuse
myofascial tenderness. X-rays of the pelvis and hips were
unremarkable (Tr. 420). Knee x-rays revealed bilateral joint
space loss at the tibial femoral joint, but otherwise were
unremarkable. Dr. Jarek assessed diffuse myofascial pain
syndrome consistent with fibromyalgia, poor sleep quality without
symptoms suggestive of sleep apnea or restless leg syndrome, and
headaches (Tr. 419-22).

On August 27, 2000, plaintiff went to the emergency room at
Bothwell Regional Health Center with a severe headache causing
vomiting and photophobia. She received an injection of Toradol
(Tr. 408).

On September 6, 2000, plaintiff went to Wetzel Clinic with
reports of pain in numerous areas. She reported she had been
diagnosed with fibromyalgia in March 2000, confirmed in June
2000. Her medications included Ultram (narcotic-like pain
reliever), cyclobenzaprine (muscle relaxer, also known as
Flexeril), Prozac (antidepressant), and Trazodone
(antidepressant). Plaintiff experienced pain in her neck,
shoulders, back, hips, and hands. She also reported nausea and
vomiting and stomach cramps that worsened with her medications,
as well as frequent headaches with photophobia, nausea, and
vomiting. On physical examination, plaintiff was tender to
palpation on most of her body. The doctor diagnosed

21

fibromyalgia, gastritis or possible irritable bowel syndrome, cephalgia (headache), and depression. The doctor discontinued her current medications and prescribed Verapamil[22], Claritin (for allergies) and Prevacid (for excess stomach acid) (Tr. 317-18).

On September 7, 2000, plaintiff returned to Wetzel Clinic with severe pain in her shoulders, neck, and right hip. The doctor gave her an injection of Toradol and prescribed Neurontin (treats seizures and nerve pain) (Tr. 319).

On September 8, 2000, plaintiff underwent a CT of her brain, which came back normal (Tr. 426).

On September 13, 2000, plaintiff underwent a gastroscope study of the esophagus. The results revealed hiatal hernia, gastroesophageal reflux and bile gastritis. (Tr. 429-30).

On October 16, 2000, plaintiff went to Janet Ahnemann, M.D., at Wetzel Clinic, for treatment on referral by another doctor. The notes show a history of "disability" and a diagnosis of "pl. trying to get disability for her fibromyalgia" (Tr. 321). Plaintiff reported that her symptoms probably started in 1997 when she was working for a vault and septic company in Kansas City (Tr. 322). Plaintiff reported that her symptoms start in her back and hips and progress to her shoulders, elbows, wrists, fingers, knees, and ankles. She said she aches all the time and

---

[22]A calcium channel blocker. Treats high blood pressure, chest pain, and irregular heart beats.

can only sleep about two hours at a time. She also reported being very depressed, tearful, and angry. On physical examination, Dr. Ahnemann noted some deformity in the joints of plaintiff's hands. Most of plaintiff's tenderness was related to areas in between joints instead of the joints themselves. Dr. Ahnemann diagnosed probable fibromyalgia, hypertension, migraine headaches, hiatal hernia, allergies, restless leg, and depression. She prescribed Paxil (antidepressant) and Klonopin (treats seizures and panic disorder), and gave plaintiff Maxalt to take for migraine headache (Tr. 322). The doctor noted that she was sending for the records of the two rheumatologists who saw plaintiff in Columbia and Springfield (Tr. 322).

On November 6, 2000, plaintiff told Dr. Ahnemann that she was hurting all over, especially her left arm. She also had severe insomnia. Plaintiff reported that she becomes lightheaded and sprained her left ankle about a week earlier (Tr. 323). The doctor examined the ankle and discovered a small goose egg, and recommended an Ace bandage and ice (Tr. 323). Dr. Ahnemann increased plaintiff's dosages of Klonopin and Flexeril (Tr. 323).

On December 4, 2000, plaintiff reported she was not doing any better and complained of frequent back spasms. Dr. Ahnemann noted plaintiff's affect was very flat. The doctor increased plaintiff's dose of Paxil and prescribed Darvon (narcotic) for pain relief (Tr. 324).

23

On January 8, 2001, plaintiff called Dr. Ahnemann, upset because she had been served with papers in her child custody case (Tr. 324). Plaintiff wanted something for the stress but the doctor suggested that she get counseling at Pathways (Tr. 324). The doctor offered to make the appointment but plaintiff declined and instead said she would make the appointment (Tr. 324).

On January 19, 2001, plaintiff reported severe pain across her low back and said she had been dizzy and off balance for two weeks. On physical examination, Dr. Ahnemann noted plaintiff was walking steady with a cane, her funduscopic exam (i.e., visual inspection of the interior of the eye) was normal, she had full movement of her eyes without difficulty, her TMs were normal, she had no carotid bruits, her heart rate and rhythm were essentially normal, lungs were clear, blood pressure was well controlled, but she was tender on palpation over her back (Tr. 324). The doctor scheduled a an MRI scan for the vertigo and prescribed Dyazide (diuretic) (Tr. 325). MRI of the brain, conducted on February 6, 2001, "may be suspicious for an arteriovenous malformation" (i.e., a congenital disorder occurring between the veins and arteries that may explain dizziness) (Tr. 434).

On February 6, 2001, plaintiff went to Dr. Ahnemann seeking a refill of her Klonopin[23] and Percocet (narcotic) (Tr. 326). The doctor called the two pharmacies involved because plaintiff

---

[23]Klonopin is often prescribed for panic disorder.

was not on Percocet (Tr. 326). On the Klonopin, the doctor wrote: "we checked on the Klonopin. She had it filled on the 29th at Boring, but also had it filled on February 1 at J&D. She denies that she had it filled at J&D, but they certainly stated that she had it filled, which should give her more KLONOPIN than she needs. . . . She had some FIORINAL WITH CODEINE (narcotic) filled in Sedalia emergency room, but other than that it doesn't appear that she's getting prescriptions from anybody else. She did have a PERCOCET (narcotic) prescription filled back in 1998 from Dr. Braverman in Sedalia."

On February 15, 2001, plaintiff called Dr. Ahnemann's office seeking more Klonopin because she was "totally out" (Tr. 327). Plaintiff received a partial refill but was instructed to talk to the doctor if she needed more (Tr. 327).

Dr. Ahnemann's February 16, 2001, notes show that plaintiff had gotten 460 mg of Klonopin since October 24, 2000, and therefore should not be out of the medication "at all" (Tr. 327). The note states that "[s]he is either abusing or selling them. Either way - no more refills" (Tr. 327).

On March 9, 2001, plaintiff continued to be dizzy and lightheaded. Plaintiff stated that she was walking with a cane. She reported she could not tolerate Effexor (antidepressant), Remeron (antidepressant), or BuSpar (anti-anxiety). Dr. Ahnemann prescribed Prozac (antidepressant) (Tr. 329).

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 25 of 86

On March 26, 2001, Dr. Ahnemann's notes read "left message on machine carotid doppler and 2-Decko were both normal" (Tr. 330).

On April 4, 2001, Kathryn Hedges, M.D., of Kansas City Clinical Neurology Associates, examined plaintiff in consultation for lightheadedness and dizziness and abnormal MRI. Neurologic examination was normal. Dr. Hedges reviewed plaintiff's MRI and believed plaintiff has an AVM[24] which is probably unrelated to lightheadedness. The doctor believed a neurosurgeon would not elect to do surgery because removal or embolization of the AVM could cause a stroke (Tr. 449-50). Dr. Hedges discussed plaintiff's MRI with a neuroradiologist who felt the MRI was normal and the thalamic lesion was not an AVM but enlarged Virchow-Robins spaces[25] (Tr. 451). Dr. Hedges concluded that "I did not find a neurologic cause for her lightheadedness and dizziness on her examination" (Tr. 451).

---

[24]An arteriovenous malformation (AVM) is a site of abnormal connectivity between arteries and veins. It is basically like a tangle of worms, where the greatest concentration of worms in the central portion of the AVM is made up of abnormal blood vessels that are hybrids between true arteries and veins. AVMs are fed by one or several arteries, and are drained by one or more major draining veins; these feeding and draining vessels may be unusually tortuous (winding like rivers), and unusually large. They can occur in the brain (brain AVMs) or along the spinal cord (spinal AVMs).

[25]The perivascular space connected to the subarachnoid space which surrounds vessels entering the brain.

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 26 of 86

On May 21, 2001, plaintiff went to Dr. Ahnemann and reported she hurt all over, especially her right knee, hip, right wrist, and low back. Darvon (narcotic) was not helping. Plaintiff wanted to see a bone specialist (Tr. 331). Plaintiff reported that she had cut back on her smoking (Tr. 331). Dr. Ahnemann noted plaintiff had full range of motion of her knee, but she was tender medially. She prescribed OxyContin (narcotic) and Zanaflex (muscle relaxer). An x-ray of her right knee showed no arthritis or fracture (Tr. 331, 342). The doctor noted that "I have put her on OXYCONTIN 10 mg b.i.d. [twice a day] and I told her under no uncertain terms she may not increase this dose unless consulting with me first" (Tr. 331).

On May 21, 2001, plaintiff called to say Zanaflex was making her vomit. She was prescribed Skelaxin (muscle relaxer) (Tr. 331).

On June 11, 2001, plaintiff returned to Dr. Ahnemann for a follow-up visit on fibromyalgia. Plaintiff said Skelaxin was helping, but OxyContin was making her heart race and causing itching. Plaintiff was still sleeping horribly. Dr. Ahnemann diagnosed fibromyalgia, slight improvement; hypertension, adequate control; and severe insomnia most likely secondary to fibromyalgia. The doctor stopped OxyContin and prescribed Ambien (sedative) and Vicoprofen (hydrocodone, a narcotic, mixed with ibuprofen, a non-steroidal anti-inflammatory) (Tr. 332). The

27

doctor recorded that "I discussed with her I would not refill this any sooner than a month" (Tr. 332).

On July 11, 2001, plaintiff told Dr. Ahnemann that Vicoprofen made her sick to her stomach, Ambien did not help her sleep, and Maxalt no longer helped her headaches. Plaintiff said she hurt everywhere and her heart would occasionally race. The doctor wrote " [s]he's had an echocardiogram in the past which is unremarkable except for some trivial mitral regurg. She had a normal left ventricular function and normal ejection fraction" Tr. 333). Dr. Ahnemann changed plaintiff's sleeping pill to Restoril, told plaintiff to go back to Darvon (narcotic), and switched her from Maxalt to Zomig (for migraines), and scheduled plaintiff for an event monitor (Tr. 333).

On July 20, 2001, Dr. Vogt's office called Dr. Ahnemann to report that plaintiff failed to show up for the event monitor to be put on (Tr. 334). This day is plaintiff's alleged onset of disability.

On July 25, 2001, Dr. Ahnemann made an appointment for plaintiff at Research for a pulmonary function test, per plaintiff's request, which came back on August 22, 2001, as normal (Tr. 334).

On September 24, 2001, Dr. Ahnemann prescribed Skelaxin (muscle relaxer) with no refills, and noted that "patient has already picked up the 60 that was called in on Friday so she will

28

only get 120 when she goes back to the pharmacy to pick up these"
(Tr. 335).

On September 26, 2001, plaintiff went to J. Scott Morrison,
M.D., for a psychiatric evaluation at the request of the agency
(Tr. 456-57).  Dr. Morrison reported that plaintiff's principle
complaint is fibromyalgia that "came on in the aftermath of her
going through a long and disappointing child custody battle" (Tr.
456).  Apparently, plaintiff's parents took custody of her three
children and refused to return them to her (Tr. 456).  Plaintiff
brought suit which resulted in her being awarded custody of the
three children but two of the three refused to return to her care
(Tr. 456).  Dr. Morrison noted that plaintiff had never had
formal psychiatric treatment, but had been receiving
antidepressant medication and sleep medication for several years
(Tr. 456).  She had been taking Prozac for six months and
Temazepam (Restoril) to help her sleep (Tr. 456).  She reported
difficulty sleeping as a result of constant musculoskeletal pain
from fibromyalgia and depression (Tr. 456).  She reported
sleeping about two to three hours a night and said she felt
exhausted most of the time (Tr. 456).  Plaintiff reported a short
period of part-time work that followed her last full-time job
that spanned from 1997 to 1999 (Tr. 457).  She denied use of
alcohol or street drugs (Tr. 457).  She described frequent crying
spells (Tr. 457).  She said that she spends most of her time at

29

home watching TV and doing household chores with the assistance of her family (Tr. 457).

On mental status examination, plaintiff looked and acted depressed and cried throughout the examination (Tr. 457). Attention and concentration were somewhat diminished by depression (Tr. 457). Memory, both recent and remote, was slightly diminished (Tr. 457). Plaintiff was not suicidal, had no psychomotor retardation, no thought disorders, no hallucinations, no delusions, and no bizarre or peculiar behavior (Tr. 457). Plaintiff related well with the examiner (Tr. 457). Plaintiff showed good insight and her judgment seemed adequate (Tr. 457). Dr. Morrison diagnosed major depression, single episode, moderate, without psychotic features (Tr. 457). He noted that plaintiff has persistent crying spells, sleep disturbance, which could be caused by fibromyalgia, and some anhedonia[26] (Tr. 457). He concluded that plaintiff was probably not disabled by her depression alone, but it would be a factor in her overall disability status (Tr. 457).

On October 2, 2001, Margaret Sullivan, Ph.D., completed a Psychiatric Review Technique form for the agency (Tr. 458-74). The doctor noted that plaintiff suffers from depression with symptoms of sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking

_____

[26]Loss of the capacity to experience pleasure.

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 30 of 86

(Tr. 461). The doctor indicated that plaintiff suffers moderate limitation in restriction of activities of daily living and difficulties in maintaining social functioning (Tr. 468). The doctor noted marked limitation in maintaining concentration, persistence, or pace (Tr. 468). The doctor concluded that plaintiff is moderately limited in her ability to understand and remember detailed instructions and her ability to carry out detailed instruction, but otherwise she is not significantly impaired (Tr. 472-73). From the doctor's review of the medical records, she opined that plaintiff's allegation of depression is not supported by the records (Tr. 474). The psychologist concluded that some of plaintiff's complaints are credible but that she could nevertheless perform tasks that are less complex and stressful as an accommodation for these credible limitations (Tr. 474).

On October 26, 2001, plaintiff went to Dr. Ahnemann for a follow-up visit, complaining about her fibromyalgia. Plaintiff reported having sharp pains in her back, neck, and hips. She stopped taking Darvon because it was upsetting her stomach. Restoril was not helping her sleep. Dr. Ahnemann believed a medication adjustment was necessary due to plaintiff's severe insomnia and continued depression. The doctor put plaintiff back on Trazodone to help her sleep, increased her Prozac

31

(antidepressant), and refilled her OxyContin (narcotic) (Tr. 493).

On November 26, 2001, plaintiff was examined by Allen J. Parmet, M.D., an occupational medicine specialist (Tr. 476-79). Plaintiff exhibited normal shoulder range of motion with passive testing, but moved only half as well when performing the movement independently (Tr. 478). Plaintiff displayed a limitation in grip strength testing, which Dr. Parmet described as volitional (Tr. 478). When asked to perform lumbar flexion[27], plaintiff flexed to only 45 degrees when standing (Tr. 478). When distracted and seated, plaintiff flexed to 80 degrees (Tr. 478). Plaintiff displayed a normal gait and station, and could retrograde tandem walk without instability (Tr. 478). When palpating fibromyalgia tender points overtly, plaintiff had ten out of 18 (Tr. 478). When distracted, plaintiff only responded to the palpation of one point (Tr. 478). Based on his examination, Dr. Parmet did not believe that plaintiff met the American College of Rheumatology diagnostic criteria for fibromyalgia, although plaintiff appeared to be significantly deconditioned (Tr. 478). Dr. Parmet believed that plaintiff would be capable of performing work at the light level and explained that this restriction was based on physical

_____

[27]Bending forward at the waist. Normal lumbar flexion is 90°.

32

deconditioning (Tr. 479).

On February 4, 2002, plaintiff went to Dr. Ahnemann and reported that she "hurt all over." Plaintiff had been trying to exercise and said her left knee was giving out on her, her right hip was painful, and her shoulders were really bothering her. On physical examination, Dr. Ahnemann noted that she tried to get a range of motion of her left shoulder but plaintiff started crying (Tr. 495). The doctor assessed fibromyalgia, chronic pain syndrome, and hypertension. She refilled OxyContin, discontinued Skelaxin, and prescribed Soma (muscle relaxer) (Tr. 495).

On March 7, 2002, plaintiff reported that she had been trying to exercise but was experiencing sharp pains in her knees and joints (Tr. 495).

On April 5, 2002, plaintiff told Dr. Ahnemann that she had been trying to do some walking. Plaintiff said that her knees and shoulders hurt, and her lower back bothered her. Dr. Ahnemann noted crepitus[28] of both knees. The doctor increased plaintiff's dosage of OxyContin and refilled Soma, and recommended that she continue to exercise to help with her fibromyalgia (Tr. 496).

On May 3, 2002, plaintiff told Dr. Ahnemann that OxyContin was helping, but she had knee pain and a migraine. Dr. Ahnemann

---

[28]Crepitus is a clinical symptom in medicine that is characterized by a peculiar crackling, crinkly, or grating feeling or sound in the joint.

33

gave her Toradol (non-steroidal anti-inflammatory) and

Phenergan[29] and refilled Soma and OxyContin (Tr. 500).

On May 31, 2002, plaintiff told Dr. Ahnemann that she kept

falling when she tried to walk. Dr. Ahnemann instructed

plaintiff to use her cane, especially when going out for a walk.

Plaintiff reported having a headache for four days. Dr. Ahnemann

noted that plaintiff's fibromyalgia was stable and the doctor

thought plaintiff's falls were most likely secondary to

fibromyalgia. The doctor gave plaintiff prescriptions for

Toradol (non-steroidal anti-inflammatory), OxyContin (narcotic),

Klonopin (treats seizures and panic disorder), and Baclofen

(muscle relaxer). X-rays of plaintiff's right wrist, right

ankle, and left knee were negative (Tr. 501, 505). The notes

acknowledge that plaintiff was on Klonopin but abused it (Tr.

501).

On June 24, 2002, Dr. Ahnemann noted plaintiff was again

very tearful. Plaintiff reported that she was still falling and

therefore was exercising inside, not outside. Dr. Ahnemann noted

plaintiff was taking Baclofen (muscle relaxer), OxyContin

(narcotic), Verapamil[30], Prozac (antidepressant), Klonopin

(treats seizures and panic disorder), and Toradol (non-steroidal

---

[29]Used to treat allergy symptoms and nausea; also used as a
sleep aid.

[30]An antihistamine. Treats nausea, vomiting, and dizziness
associated with motion sickness; also treats vertigo.

34

anti-inflammatory). The doctor prescribed Zyprexa to help with sleeplessness and depression (Tr. 503).

On July 16, 2002, plaintiff told Dr. Ahnemann that she was about the same with constant pain and trouble with her knee giving out. Plaintiff had lost another five pounds, which pleased her. Dr. Ahnemann gave plaintiff samples of several of her medications because plaintiff had lost her Medicaid benefits (i.e., plaintiff's Medicaid benefits were being re-evaluated because she made too much money from her husband's disability) and she could not afford all of her prescriptions (Tr. 504).

On August 13, 2002, plaintiff returned for follow-up visit on fibromyalgia. Plaintiff reported that she was hurting all over and wanted the dose of Klonopin increased. Dr. Ahnemann increased her doses of Klonopin and Zyprexa (anti-psychotic), and refilled OxyContin (narcotic), Prozac (antidepressant), and Trazodone (antidepressant) (Tr. 515).

On September 23, 2002, Dr. Ahnemann wrote a letter and reported that plaintiff had been her patient since October 2000, and was seen prior to that time by two rheumatologists who had diagnosed her with fibromyalgia. The doctor noted that on her initial visit, plaintiff had multiple tender points consistent with fibromyalgia, along with sleep disturbance. Plaintiff did not have evidence of rheumatologic disease indicating rheumatoid arthritis or lupus. Dr. Ahnemann noted that plaintiff also had

35

coexisting depression, which was a symptom of fibromyalgia. She reported that plaintiff has been in a significant amount of pain and has been treated with multiple medications. The doctor noted that plaintiff had steadily gone downhill in the past two years and was using a cane for balance when walking. Dr. Ahnemann pointed out that plaintiff had multiple tender trigger points and tenderness with range of motion especially of her large joints on physical exam of March 7, 2002. Dr. Ahnemann disagreed with Dr. Parmet's opinion that plaintiff does not meet the diagnostic criteria for fibromyalgia. Dr. Ahnemann concluded plaintiff does meet the criteria for fibromyalgia and pointed out that Dr. Jarek and Dr. Katwa reached this same conclusion. Dr. Ahnemann believed that plaintiff was totally disabled and unable to work in any job at that time (Tr. 507).

On September 30, 2002, plaintiff went to Dr. Ahnemann for follow-up visit on fibromyalgia. Plaintiff described stabbing pain in her back and general pain in her leg, shoulder, and ankle. Plaintiff had lost 14 pounds in six weeks and weighed 136 pounds. Her depression was worse. Dr. Ahnemann increased the dose of Prozac (antidepressant) and OxyContin (narcotic), and continued Zyprexa (anti-psychotic to aid with sleep) and Klonopin (treats seizures and panic disorder) (Tr. 516).

On October 10, 2002, Robert Pulcher, Ph.D., administered the Wechsler Adult Intelligence Scale III (WAIS-III) on plaintiff.

36

Plaintiff achieved a verbal IQ of 74, performance IQ of 81, with full scale IQ of 76 (Tr. 508-12).

On October 30, 2002, plaintiff returned to Dr. Ahnemann. Plaintiff had a severe headache for four days with photophobia but no nausea. She was crying and very upset and reported being very depressed. Plaintiff said that her dose of OxyContin was not lasting long enough and Prozac was not working. Dr. Ahnemann noted that plaintiff was walking with a cane and was crying fairly inconsolably. The doctor said plaintiff had really poor insight into her disease and was very depressed. The doctor assessed intractable pain from fibromyalgia and severe depression exacerbating fibromyalgia. The doctor increased the dose of OxyContin, discontinued Prozac, and gave plaintiff Lexapro (antidepressant) (Tr. 518).

On February 6, 2004, plaintiff returned to Dr. Ahnemann for treatment of fibromyalgia and chronic pain. Plaintiff no longer had a Medicaid card so she could not afford her medications and asked the doctor to fill out a form so she could get them at a reduced rate (Tr. 537).

On May 12, 2004, plaintiff went to Dr. Ahnemann for a follow-up visit on fibromyalgia. Plaintiff was in less pain and was not walking with a cane. Plaintiff was still experiencing migraines. Dr. Ahnemann reported plaintiff was taking MS Contin (morphine, a narcotic) and Vicodin (acetaminophen [Tylenol] and

37

hydrocodone [narcotic]) for pain from fibromyalgia; Klonopin for
anxiety; and Trazodone (antidepressant) for sleep.  Plaintiff
denied depression and was off her Lexapro, Zyprexa, and Baclofen
(Tr. 536).  The record reads in part as follows:

> She has not been in [for] a couple of months because she
> lost her Medicaid card.  She now has her Medicaid card.
> During the interim, she remained on Klonodine, MS Contin and
> Vicodin. . . .  [S]he states she is doing very well.  She is
> in the least amount of pain that she has been in [for]
> sometime. . . .  She really does look good.  She is not
> walking with a cane today and she has tapered off since she
> ran out of her Medicaid card and did not refill some of her
> medications, and has done well off of them.

> Dr. Ahnemann assessed:

> 1)  Fibromyalgia, good control.

> 2)  Depression, not currently exhibiting any.  The patient
> is off all antidepressants.

> 3)  Anxiety, under good control.  She did mention her son
> had been shot in Iraq and she has been to Washington DC visiting
> him.  She seems to be handling this quite well.

On June 8, 2004, plaintiff said she tried Naprosyn (non-
steroidal anti-inflammatory) for a migraine but it caused
vomiting and she wanted to go back on Toradol.  Plaintiff was
having pain in her low back and hips.  Dr. Ahnemann refilled MS
Contin (narcotic) and Klonopin (for anxiety).  Plaintiff declined
chiropractic care and physical therapy because she could not
afford it (Tr. 535).

On September 1, 2004, Dr. Ahnemann noted plaintiff's joints
were swollen in both hands and she had tender trigger points all
over.  Plaintiff was using a cane again because her legs were

weak.  Plaintiff reported spasms in all muscles (Tr. 533-34).

On October 6, 2004, plaintiff went to Dr. Ahnemann with reports of continued pain from fibromyalgia.  On physical examination, Dr. Ahnemann noted pain in plaintiff's cervical area, upper arms, lower back, upper legs, shoulders and trigger points.  The doctor discontinued Vicodin, prescribed Percocet (narcotic), and refilled Klonopin and Toradol for migraines (Tr. 531-32).

On November 3, 2004, plaintiff returned to Dr. Ahnemann for medication refills and treatment of fibromyalgia.  Plaintiff had fallen down the stairs at her home three weeks earlier (Tr. 529-30).

On December 6, 2004, plaintiff went to Dr. Ahnemann and reported that she was in more pain than usual that day from fibromyalgia.  Plaintiff could not sleep because of pain and was having spasms in her legs.  Plaintiff experienced loss of balance, like the room was spinning, for three days.  Dr. Ahnemann diagnosed fibromyalgia, worsened with cold weather; vertigo; and depression.  The doctor increased the dose of MS Contin and Trazodone, prescribed Meclizine (treats nausea, vomiting, and dizziness), and restarted Lexapro (antidepressant) (Tr. 527-28).

On December 13, 2004, plaintiff called Dr. Ahnemann requesting that the doctor fill out paperwork so plaintiff could

39

become a foster parent.  Dr. Ahnemann refused based on
plaintiff's health and medications.  The doctor thought it would
be too hard on plaintiff to be a foster parent (Tr. 526).

On January 3, 2005, plaintiff went to Dr. Ahnemann for a
follow-up visit on fibromyalgia.  Plaintiff reported that she
hurt all over and had fallen earlier (Tr. 523).  Dr. Ahnemann
prescribed Lortab (narcotic), MS Contin (narcotic), Toradol (non-
steroidal anti-inflammatory), and Klonopin (for anxiety).

## C.   *RESIDUAL PHYSICAL FUNCTIONAL CAPACITY ASSESSMENTS*

There are four residual physical functional capacity
assessments in the record, three by plaintiff's treating
physician and one by an agency's consulting physician.

On March 9, 2001, Dr. Ahnemann completed a Medical Source
Statement-Physical on plaintiff.  The doctor noted plaintiff
retained the maximum capacity to frequently lift and or carry
less than ten pounds; occasionally lift and or carry less than
ten pounds; stand and/or walk continuously for ten minutes; sit
continuously for 15 minutes; never climb, balance, stoop, or
bend; and was limited in her ability to reach, handle, finger, or
feel.  Dr. Ahnemann indicated these activities were limited
because plaintiff's hands are stiff, swollen, painful, numb, and
cold; she has Heberden's nodule[31] of her left third digit; she is

_____

[31]A small hard fixed bump on the finger, usually at the last
joint of the finger.  A Heberden nodule is a calcified spur of
the joint (articular) cartilage.  It serves as a useful sign of

light-headed and walks with a cane because of balance issues; and
brain MRI revealed possible AV malformation.  The doctor noted
that plaintiff's limitations include pain, discomfort, and/or
other subjective complaints.  The doctor's assessment was for the
period of October 16, 2000, to March 9, 2001.  The doctor
concluded that plaintiff has a physical disability that would
permanently prevent her from engaging in gainful activity (Tr.
443-44).

About six months later, on October 1, 2001, Dr. Ahnemann
completed another Medical Source Statement-Physical on plaintiff
covering the period of March 10, 2001, through October 1, 2001.
The limitations were the same as in her report dated March 9,
2001 (Tr. 445-46).

On December 11, 2001, Dr. Robert E. Hughes, M.D., a
consulting physician for the agency, did a residual physical
functional capacity assessment on plaintiff (Tr. 481-89).  Dr.
Hughes wrote that plaintiff was alleging multiple and complex
symptomatologies of pain in the musculoskeletal areas, plus
complaints of dizziness and lightheadedness (Tr. 486).  The
doctor observed that plaintiff's treating physician had ordered
multiple examinations in response to these complaints (e.g., MRI
and CT of the head), which came back normal after review by
several consultants (Tr. 486).  The doctor also observed that

osteoarthritis.

plaintiff saw a Dr. Greidinger on May 30, 2000, who found plaintiff's range of motion normal in her upper extremities, and also found trigger points for fibromyalgia in control points during plaintiff's examination (Tr. 486). The consulting doctor noted that "the MER contains evidence of drug seeking behavior" in that plaintiff had obtained extra medication from various physicians (Tr. 486). The consulting doctor also noted that although plaintiff had been referred for psychiatric intervention, she had declined to pursue that recommendation (Tr. 486). The consulting doctor observed that Dr. Ahnemann's opinion of October 1, 2001, i.e., that plaintiff is capable of only performing sedentary work, is not supported by the doctor's medical notes (Tr. 486). The consulting physician also noted that Dr. Parmet opined on November 26, 2001, that claimant exhibited volitional limitation of grip strength and motion (Tr. 487). The consulting physician concluded that plaintiff is capable of doing light work (Tr. 487).

On January 18, 2005, Dr. Ahnemann completed a Medical Source Statement regarding plaintiff's physical limitations. She noted that plaintiff can lift no more than five pounds frequently; stand and/or walk continuously for one-half hour and for a total of four hours per day; sit continuously for one-half hour and for a total of four hours; should never climb, balance, stoop, kneel, crouch or bend; and is limited in her ability to reach, handle,

42

and finger objects.  She reported that plaintiff has bilateral shoulder and hand pain which would limit her abilities, and noted that cold temperatures exacerbate her fibromyalgia.  In reaching her determination of plaintiff's limitations, Dr. Ahnemann noted that plaintiff has multiple trigger points that are extremely painful, she suffered from depression secondary to her limitations, she has severe pain, she walks with a cane, and suffers frequent falls.  The doctor concluded that plaintiff's disability prevents her from engaging in employment or gainful activity for which she would be qualified by her age, training, experience, or education (Tr. 519-20).

**D.    *SUMMARY OF TESTIMONY***

There is testimony from three administrative hearings, which is summarized in chronological order.

**TESTIMONY FROM HEARING OF MARCH 27, 2001**

**Testimony of plaintiff**

At the March 27, 2001, administrative hearing, plaintiff testified that she was then 38 years old and weighed about 165 pounds, which was about 40 pounds over her normal weight (Tr. 146-47).  She has an eighth grade education and never received a GED (Tr. 147-48).

Plaintiff identified her main doctor as Dr. Ahnemann (Tr. 180).  Plaintiff started using a cane about six months before the hearing (Tr. 160).

43

Plaintiff represented that her most disabling condition is her fibromyalgia, which is experienced "all over" (Tr. 148). Specifically, she feels pain in her shoulders, hips, arms, legs, knees, and feet (Tr. 156). This condition started in 1998 and eventually caused her to stop working in November of 1999 (Tr. 149). Plaintiff indicated that she attempted to do lighter work (e.g., at a flower shop) and found that she was unable to do anything (Tr. 150).

In addition to her pain, plaintiff indicated that she suffers from dizziness and migraine headaches (Tr. 152). Her headaches may occur two to three times a week and last sometimes a day (Tr. 154). She has to go the hospital and receive shots to relieve the headaches (Tr. 154). Over a year's time, she went to the hospital two to three times (Tr. 155). Plaintiff reported suffering from muscle spasms about two to three times per month (Tr. 154).

Plaintiff drives but infrequently (Tr. 152). The trips are usually to town and last about 20 to 30 minutes (Tr. 152).

During the course of the hearing, defendant broke down and started to cry (Tr. 153). She has not undertaken counseling for depression because she has no money to pay for it (Tr. 153).

In terms of her physical capacity, plaintiff said she could not lift anything including her own purse (Tr. 157). She also experiences difficulty with reaching and her wrists give out (Tr.

44

157).  Plaintiff represented that her capacity to walk varies
with the day, sometimes for as long as an hour and other times
for only about ten to 15 minutes (Tr. 157).  After walking,
plaintiff must sit for about ten to 20 minutes (Tr. 158).  When
asked whether she could do a job that would allow her sit and
stand when necessary without any lifting, plaintiff said that she
could not because she can neither stand nor sit for long periods
and she sometimes cannot pick things up (Tr. 158-59).  Plaintiff
stated that she could not do work as a receptionist, which would
have no physical requirements, because she cannot concentrate and
talk to people, and she stutters as a result of the pain (Tr.
159).  Plaintiff requested to stand during the course of the
hearing, apparently in some discomfort (Tr. 159).

        Plaintiff reported taking a lot of medication for her
various conditions (Tr. 155).  The side effects of these
medications include making her "deathly ill" to her stomach,
throwing up, dizziness, and passing out (Tr. 155).  She has been
given "stomach pills" to help with the side effects (Tr. 156).
The medication also increases her fatigue and turns her into
something akin to a "zombie" (Tr. 156).

        Plaintiff's husband is disabled and they live off his
disability payment (Tr. 153).

        According to plaintiff, her daily activities are very
limited with her only occasionally doing normal household tasks

45

such as laundry (Tr. 154). She occasionally does the shopping but uses a wheelchair because she begins hurting when she walks (Tr. 156). Plaintiff has no hobbies (Tr. 158).

**Testimony of plaintiff's husband**

Plaintiff's husband testified and essentially corroborated plaintiff's description of her disabling pain (Tr. 162). He acknowledged his own disability beginning in 1991, and stated that he receives about $1,000 per month in disability payments (Tr. 162; 166).

Although himself disabled, plaintiff's husband does the lion's share of the household duties including dishes, vacuuming, and laundry (Tr. 163-64). He indicated that he will not allow plaintiff to drive because "[s]he falls over on the floor, and staggers around sometimes, and I don't know whether, you know, what all it's from, but I don't want her under the wheel that way" (Tr. 163).

The husband confirmed plaintiff's weepiness, which he opined occurs several times a month (Tr. 164).

Concerning plaintiff's muscle spasms, the husband described them as dating back to 1998, occurring in her chest, and feeling like a "heart attack" (Tr. 165). According to the husband, plaintiff's complaints are now 300 times worse than they were when they first got married four and a half years earlier (Tr. 163).

46

**TESTIMONY FROM HEARING OF SEPTEMBER 25, 2002**

**Testimony of plaintiff**

At the September 25, 2002, hearing, plaintiff testified that she then was 39 years old, stood 5' 3" tall, and weighed 138 pounds (Tr. 48-49). Plaintiff stated that she dropped out of school in the eighth grade and has trouble with reading and comprehending what she reads (Tr. 51). According to plaintiff, her parents did not want her in special education classes (Tr. 51-52).

Plaintiff testified that she lives with her husband, her two sons, and a daughter (Tr. 52). Plaintiff said that she has a driver's licence but scored very low on the multiple-choice examination (Tr. 52).

Plaintiff stated she last tried to work in a flower shop but quit because she was in too much pain (Tr. 53). Before that, plaintiff worked in septic-tank maintenance where she had to lift 100 pounds. She left that job because of pain (Tr. 53-54).

Plaintiff testified that her primary problem is fibromyalgia (Tr. 55). Plaintiff said that she has difficulty with the disease every day (Tr. 55-56). She has pain in her shoulders, back, knees, and all over, and her hands go numb and her hips give out (Tr. 55). She is unable to sleep because of pain, so she tries to nap during the day (Tr. 57). Plaintiff's doctor has

47

recommended counseling, but she said that she could not afford it (Tr. 57-58).

Plaintiff testified her medications make her drowsy and sick to her stomach. She said her hands swell, she has migraines, and she is having memory problems (Tr. 58). She does no lifting (Tr. 57-59). In describing her daily activities, plaintiff testified she tries to do laundry using a rolling hamper. If she is in too much pain to load the machine, her husband or children will help. She cannot pick up wet laundry. Plaintiff said she can cook frozen dinners, but her husband does most of cooking and shopping. Plaintiff stated that she does not go many places (Tr. 59-61).

Plaintiff testified she tries to avoid bending because it causes pain, and she can walk only a short distance before she must stop due to pain (Tr. 63). Plaintiff thought she could stand for ten to 15 minutes (Tr. 63-64).

Plaintiff testified she cries two to three times a day and is very depressed because she is unable to do so many things (Tr. 62-64).

**Testimony of plaintiff's husband**

James Warren, plaintiff's husband, testified that they had been married five years at the time of the hearing and that his wife's condition had gone downhill fast (Tr. 65). He said he cannot touch her without causing her pain (Tr. 65). He also

48

described severe migraines (Tr. 65).

Plaintiff's husband testified plaintiff has tried exercising to help relieve her condition (Tr. 66). Her medications cause nausea and she often falls without warning (Tr. 66-67). Plaintiff's husband cooks and does laundry with help from his daughter (Tr. 64-67).

Plaintiff's husband is disabled and living on Social Security disability for degenerative joint disease, osteoarthritis, spondylosis L5, S1, and cirrhosis of the liver he believes to be caused by medication (Tr. 68).

**TESTIMONY FROM HEARING OF JANUARY 27, 2005**

**Testimony of plaintiff**

At a hearing on January 27, 2005, plaintiff testified she lives with her husband and 12-year-old son (Tr. 73).

Plaintiff testified that she tried to work as a housekeeper in a hotel in 2003 (Tr. 75). Plaintiff represented that she worked 20 hours a week and that her daughter helped (Tr. 75). She said she only lasted three months because she was unable to perform the job. Plaintiff said she worked two to three hours a day after which she would suffer excruciating pain in her back, legs, and shoulders (Tr. 73-76).

Plaintiff testified her doctor said she has fibromyalgia and arthritis in her hands (Tr. 77). Plaintiff said she is in constant pain and her medications do not help. Plaintiff said

49

she has no energy (Tr. 77). She said that she is always tired and that her legs frequently give out (Tr. 77). Plaintiff stated she has fallen ten times in the last two days (Tr. 77). Plaintiff said she uses a cane prescribed by her doctor and also uses a walker once or twice a month. Plaintiff said that these assistive devices were paid for by Medicaid (Tr. 77-79).

Plaintiff estimated she could sit 15 to 20 minutes and walk 15 to 20 minutes (Tr. 80). Plaintiff said that she walks very slowly due to pain (Tr. 80). Plaintiff said that she does very few chores (Tr. 80-81). She stated she may fold some laundry, but her shoulders and arms hurt as a result (Tr. 81).

Plaintiff became tearful at the hearing and testified she cries four to five times a day (Tr. 81). Plaintiff said she is depressed and in pain (Tr. 81). Plaintiff said that her doctor suggested physical therapy, but it would take an hour to drive to the therapist (Tr. 82). The chiropractor near her home will not take Medicaid (Tr. 82).

When asked if her habits have changed because of her condition, plaintiff testified she no longer wears a bra because she cannot put it on (Tr. 83). She said she wears sweat pants because she is unable to button(Tr. 83). Plaintiff said that her pain keeps her from sleeping, and therefore she tries to nap during the day (Tr. 83). Plaintiff said she has no hobbies (Tr. 84).

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 50 of 86

Plaintiff described problems with memory, focus, and concentration (Tr. 84). She does very little lifting (Tr. 85). Her hands swell and she has no grip (Tr. 85).

**Testimony of plaintiff's daughter**

Billie Fournier, plaintiff's 19-year-old daughter, testified that she had lived with her mother until 14 months ago (Tr. 86). When she lived at home, Ms. Fournier had to help her mother use the bathroom (Tr. 87). She testified that she has seen plaintiff fall multiple times (Tr. 87).

Ms. Fournier stated that she and her brother used to clean the kitchen and bathroom and do the laundry because plaintiff was unable to do the work (Tr. 88). Ms. Fournier testified that she often takes her brother places like shopping or bike riding because her mother is unable to do so (Tr. 88).

Ms. Fournier stated that her mother has been in this condition for three and one-half years, and it has worsened over the years (Tr. 91). She said that plaintiff tries to do things, but she is unable to do anything (Tr. 91).

**Interrogatory evidence from vocational expert**

In a report dated April 30, 2005, John McGowan, a vocational expert, responded to questions posed by the ALJ (Tr. 253-56).

Based on his review of the exhibits, the vocational expert characterized plaintiff's past relevant work as including a machine operator, box-folding machine operator, and septic tank

51

installer.  He said these jobs were either medium or heavy

exertion level (Tr. 255).

The ALJ asked the vocational expert to make the following

assumptions in responding to the questions:

The plaintiff is a 42-year-old individual with an 8th grade
education who retains the residual functional capacity to
perform the exertional and nonexertional requirements of
work with the following limitations:  The plaintiff can
perform work at the light-exertional level except that she
cannot work at unprotected heights or around dangerous
machinery, or do more than simple repetitive work (Tr. 254).

Based on these assumptions, the vocational expert opined

that plaintiff could not perform any of her past relevant work.

He indicated that these limitations would allow simple,

repetitive work at the light level.  He provided the following

examples:

Assembler, small products, light exertion;

Assembler, plastics hospital products, light exertion;

Machine tender, textile products, sedentary exertion; and

Stuffer, sports equipment, sedentary exertion.

(Tr. 255).

The vocational expert indicated that data from the Missouri

Division of Employment Security show that there are 69,000 jobs

in Missouri classified as assemblers and hand workers, with 4,687

of these jobs in the Central Zone (Tr. 256).

*E.  FINDINGS OF THE ALJ AND APPEALS COUNSEL*

The record contains three opinions by the ALJ and one remand from the Appeals Counsel.  I summarize them in chronological order.

**June 27, 2001, decision**

On June 27, 2001, the Honorable Thomas C. Muldoon, ALJ, entered his decision denying plaintiff's application for Social Security disability benefits (Tr. 96-104).  The ALJ proceeded to step five in the sequential evaluation and concluded that plaintiff could perform a range of medium work in the national economy (Tr. 103-04).

**November 22, 2002, decision**

On November 22, 2002, the Honorable Thomas C. Muldoon, ALJ, issued his decision denying plaintiff's application for Social Security disability benefits (Tr. 126-37).

By way of background, the ALJ reported that plaintiff alleged disability based on fibromyalgia (Tr. 127).  The affliction caused her to experience falling spells two to three times per week (Tr. 127).  Plaintiff represented that her fibromyalgia had caused arthritis and numbness in her hands and resulted in both sleeplessness and depression (Tr. 127).  Plaintiff explained that she had not sought counseling for depression because she could not afford it (Tr. 127).

53

In terms of physical capacity, the ALJ recounted that plaintiff claimed to be unable to carry anything repeatedly, could lift a gallon of milk only occasionally, could not stand for more than ten to 15 minutes, could not walk very far, and could do no forward bending (Tr. 127). She represented that she rarely left her house except to see her doctor (Tr. 127).

The ALJ reported that plaintiff's husband of five years stated that she had gone "downhill pretty fast" to where she was unable to drive or do normal household tasks (Tr. 128).

The judge divided his opinion into two sections: Part I discussing earlier-dated medical evidence and some new evidence dated before June 27, 2001, the date of the first decision; and Part II discussing medical evidence after June 27, 2001, to determine whether plaintiff should be found disabled based on her then new application filed July 20, 2001 (Tr. 129).

The ALJ observed that plaintiff "had a scattered and somewhat erratic work record, with fair earnings in most years but little or no earnings in others" (Tr. 129).

Based on post-hearing intelligence testing, the ALJ concluded that plaintiff has a low average to borderline intelligence functioning but is not mentally retarded (Tr. 129). Although plaintiff may have reading deficiencies, the ALJ found that she is not illiterate (Tr. 129-30).

54

After recounting the medical evidence, the ALJ concluded that there was no persuasive medical reason why plaintiff's residual functional capacity through June 30, 1995, and at any time before November 9, 1999, was any worse than that which the ALJ found in his June 27, 2001, decision (Tr. 130-31). He concluded that plaintiff's daily activities are restricted by choice and not by any apparent medical proscription (Tr. 131).

Concerning plaintiff's anxiety and depression, the ALJ found that these did not significantly impair her ability to think, understand, communicate, get along with others, and handle normal work stress (Tr. 131).

The judge also found no persuasive medical reason why plaintiff's residual functional capacity was worse at the time of this order than on June 27, 2001, the date of his earlier decision (Tr. 132).

After recounting the then-recent medical evidence, the ALJ concluded that plaintiff's complaints of impairments limiting her ability to work were not credible (Tr. 134). The ALJ found that plaintiff could perform a full range of medium work, and therefore was not disabled under the Social Security Act (Tr. 133-37).

**September 24, 2004, Appeals Council remand**

On September 24, 2004, the Appeals Council vacated the ALJ's November 22, 2002, decision and remanded the case to the lower

55

court for resolution of three issues: (1) an evaluation of the treating and examining physicians' conflicting opinions, (2) the absence of vocational evidence about the extent to which the plaintiff's limitations erode the occupational base for medium work, and (3) a determination of whether plaintiff had sufficient quarters of coverage to qualify for disability insurance benefits (Tr. 168-69).

**June 29, 2005, decision on remand**

On June 25, 2005, the Honorable Thomas C. Muldoon, ALJ, entered a decision in plaintiff's case on remand from the Appeals Council (Tr. 15-29). On remand, the ALJ was to consider two factors: (1) whether plaintiff had sufficient quarters of coverage to qualify for Disability Insurance Benefits and (2) additional evidence on plaintiff's maximum residential functional capacity (Tr. 18; 19).

In reviewing the evidence, the ALJ incorporated by reference his November 22, 2002, decision containing a summary of the testimony from the prior administrative hearing and the medical evidence and opinions then available, and proceeded to summarize the new evidence (Tr. 19-20).

The ALJ recounted plaintiff's complaints as including fibromyalgia or myofascial pain syndrome, gastroesophageal reflux disease, hypertension controlled with medication, infrequent migraine headaches, status post cholecystectomy, borderline

56

intellectual functioning, and mild depression/anxiety (Tr. 21).

In justifying his decision to discount the opinion of plaintiff's treating physician, the ALJ summarized the three medical source statements provided by Janet Ahnemann, M.D., including her most recent statement in which she said that plaintiff could lift less than five pounds; stand or walk only 30 minutes continuously and for a total of four hours; sit for a total of four hours and only 30 minutes on a continuous basis; could never climb, balance, stoop, kneel, couch, or bend; and never reach, handle, or finger (Tr. 22). The ALJ observed that these conclusions were not supported by a consulting physician (Allen J. Parmet, M.D.) and a non-examining physician (Robert E. Hughes, M.D.), both of whom found that plaintiff could work at a light exertional level (Tr. 22).

Acknowledging that a treating physician's opinion is ordinarily entitled to great weight, the ALJ nevertheless discredited Dr. Ahnemann's opinion because (1) she is a general practitioner, (2) her restrictions as to plaintiff's capacity appear only in documents prepared at the request of plaintiff's counsel and not in the medical records, (3) her restrictions are unsupported by clinical signs, and (4) her restrictions conflict with other available information about plaintiff including plaintiff's daily activities, plaintiff's request to act as a foster parent, and the doctor's directive that plaintiff walk and

57

do exercises (Tr. 23).

On the diagnosis of fibromyalgia, the ALJ observed that although physicians other than Dr. Ahnemann have diagnosed this condition, there are few clinical findings to support the conclusion and that plaintiff responded to tender points associated with fibromyalgia and also control points (Tr. 23-24).

The ALJ also noted that plaintiff has demonstrated a pattern of failing to follow up with recommended care including treatment for her psychiatric condition, physical therapy, and evaluation of a knee problem (Tr. 24).

As to plaintiff's psychiatric problems, the ALJ found no reason to alter his earlier decision that plaintiff's low/ borderline intellectual functioning coupled with her depression/ anxiety are "no more than minimal limitations in her ability to do basic work activities" (Tr. 25).

Based on this analysis, the ALJ found that plaintiff could perform light work such as a small products assembler II, plastic hospital products assembler, textile machine tender, and sports equipment stuffer; and concluded that plaintiff is not disabled under the Social Security Act (Tr. 28).

## V.   *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

58

## A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is
primarily for the Commissioner to decide, not the courts.
Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there
are inconsistencies in the record as a whole, the ALJ may
discount subjective complaints.  McClees v. Shalala, 2 F.3d 301,
303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th
Cir. 1984).  The ALJ, however, must make express credibility
determinations and set forth the inconsistencies which led to his
or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir.
1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).
If an ALJ explicitly discredits testimony and gives legally
sufficient reasons for doing so, the court will defer to the
ALJ's judgment unless it is not supported by substantial evidence
on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit
plaintiff's subjective complaints is supported by substantial
evidence.  Subjective complaints may not be evaluated solely on
the basis of objective medical evidence or personal observations
by the ALJ.  In determining credibility, consideration must be
given to all relevant factors, including plaintiff's prior work
record and observations by third parties and treating and
examining physicians relating to such matters as plaintiff's
daily activities; the duration, frequency, and intensity of the

59

symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 at 1322.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> Examination of the claimant by consultative physician, Allen J. Parment [sic], M.D., an occupational medicine specialist, casts some doubt on the severity of claimant's reports of pain and limitation. On examination the claimant abducted her shoulders to only 90 degrees, but passively she had a normal range of motion of 180 degrees. The claimant displayed a voluntary limitation of grip strength, which Dr. Parment [sic] described as volitional. The claimant flexed her lumbar spine to only 45 degrees when standing, but while distracted and sitting she was able to flex to 80 degrees. Although Dr. Ahnemann's notes reflect complaints by the claimant of pain in the hips, knees and ankles, when examined by Dr. Parment [sic] the claimant had normal range of motion of all three joints. The claimant's gait and station were normal. The claimant was able to retrograde tandem walk without instability. It is significant to note that when fibromyalgia tender points were palpated the claimant had several tender points in the neck, elbow, and knee giving her a score of 10/18; however, when she was distracted, she responded to only one of these tender points. . . .

> The claimant was examined by Eric L. Greidinger, M.D., a specialist in rheumatology. . . . Although the claimant did have tender points of fibromyalgia, she also had control points like the arms and legs that were also tender. . . .

> Although the claimant reported to Dr. Ahnemann that she frequently falls, and at one point the doctor attributed the falls to fibromyalgia, falling is not a usually recognized fibromyalgia symptom. There is little evidence that the claimant sought emergency room care due to any fall. There is no medical evidence of any disorder imaging results either musculoskeletal, cardiovascular or otherwise, that would account for the alleged falling spells. X-rays of the claimant's knees are essentially negative.

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 60 of 86

There are several instances where the claimant has not
sought to follow through with recommended care.  Although
the claimant has been treated by Dr. Ahnemann for depression
and anxiety with psychotropic medication, the claimant has
not followed through with recommendations to seek
specialized psychiatric care.  The claimant has not followed
through with recommendations to receive physical therapy.
When the claimant complained of joint pain in the left knee,
which she described as feeling like bone on bone grating,
she indicated that she did not wish further evaluation of
her knee.  Moreover, a subsequent x-ray showed her knee to
be unremarkable. . . .

According to the claimant's own testimony she worked part
time during the period she alleges she was disabled.  It is
significant to note that while the claimant's husband is
disabled and that claimant alleges disability, she told Dr.
Ahnemann that she was interested in becoming a foster parent
and requested support from the doctor in this endeavor.
Seeking to become a foster parent is incongruous with an
allegation of disability.  The claimant might also have an
underlying financial motive for seeking benefits as her
husband became entitled to disability benefits, which made
hr ineligible for Medicaid.

1.    **PRIOR WORK RECORD**

Concerning plaintiff's prior work history, it is clear that

this does not support her credibility.  The earnings record shows

her working sporadically over the years with de minimus earnings

for most years.  For example, in 1982-83 and at about age 20,

plaintiff had no income; in 1986-87 at about age 23, plaintiff

had no income; and from 1988-90, plaintiff earned about $1,084.00

for the three years combined.

In 1997-99, at about age 37, plaintiff finally got a full-

time job making a living wage, and this turns out to be her last

employment.  She was working as a laborer and was regularly being

examined by occupational medical doctors as a result of injuries

61

incurred on the job. It was during this time frame when plaintiff represents that she began to experience her relentless pain that caused her to stop working. She quit her job. No occupational physician examining plaintiff at the time diagnosed any problem that would prevent her from returning to work. Indeed, one would expect that if plaintiff's impairments at this time caused her to stop working, she would have at least raised these problems with the occupational doctors in the hope of receiving some relief and possibly even a disability payment from her employer.

It is telling that on June 16, 1999, plaintiff went to the Osage Valley Medical Center complaining about stress resulting from the custody dispute involving her children, and asking for a note to excuse her from work (Tr. 377). It is inconceivable that plaintiff would complain about her stress level when seeking to be excused from work but never mention the unrelenting pain she was allegedly experiencing at the time.

Plaintiff alleges that she wanted to continue to work but failed in her efforts. As evidence, plaintiff points to two failed attempts to return to the workplace, i.e., a job at a flower shop in 2000 and a job at a motel in 2003. However, these two attempts to return to the workplace are suspect when one considers them in light of the sworn testimony plaintiff gave at three administrative hearings during this same frame, i.e., the

62

January 27, 2005, hearing at which plaintiff described her daily activities as virtually non-existent and her daughter stated that this state of inactivity had been ongoing for three and a half years; the September 25, 2002, administrative hearing at which plaintiff represented that her most strenuous physical activity each day was rolling a hamper of clothing into the laundry; and the March 27, 2001, administrative hearing at which plaintiff testified that she could not even lift her purse. Given plaintiff's testimony about her lack of physical capacity during this period, one would be surprised to learn that she had left the house, applied for employment, went to work, and actually did something productive that resulted in the payment of approximately $1,800.00 for two quarters in 2003 (Tr. 197). The reasonable inference to be drawn from this comparison is that plaintiff has a tendency to exaggerate the extent of her pain and incapacity.

The plaintiff's prior employment record detracts from her credibility.

## 2. DAILY ACTIVITIES

Concerning plaintiff's daily activities, she alleges that she does virtually nothing each day and that it has been so since her last employment in 1999-2000. Any household tasks she undertakes must be performed with assistance from her family.

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 63 of 86

While there is no contradictory evidence that plaintiff is essentially homebound, the question remains whether this is function of her physical and mental health problems or a choice made by plaintiff that has been supported by her family and physician. In fact, no medical professional has recommended the essentially sedentary lifestyle plaintiff lives. To the contrary she has been told to exercise. From 2001 until 2005, plaintiff testified three times about her very limited abilities and activities. She testified consistently that she could only sit for a few minutes at a time and even had to stand during the administrative hearing in 2001 because sitting was too painful. She testified that she fell ten times in the past two days. She testified that she could not participate in physical therapy as recommended by her doctor because she could not tolerate the one-hour trip to the therapist's office. Yet, during this same time plaintiff managed to travel to Washington DC.

Based on my review of the administrative and medical records, and as discussed later, I agree with the ALJ plaintiff's daily activities are limited due to her own personal choice and not due to her impairments. This factor weighs against plaintiff's credibility.

**3.    DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS**

Concerning plaintiff's description of her symptoms, plaintiff has consistently complained to everyone - her family,

64

doctors, and agency personnel - that she feels constant and unremitting pain throughout her entire body, day-in and day-out; yet there is surprisingly little independent substantiation for these complaints in the medical records. For example, the ex-rays, MRIs and CTs performed on plaintiff as a result of her complaints show nothing that would cause this chronic pain; and although the physical examinations of plaintiff for fibromyalgia have resulted in both positive trigger points and positive control points, the treating doctors seem to ignore this inconsistency in the data and simply adopt fibromyalgia as their diagnosis without explanation. Concerns about the lack of substantiation for plaintiff's complaints are expressed by (1) a consulting physician, Robert E. Hughes, M.D., who observed that plaintiff's treating physician had ordered multiple examinations in response to plaintiff's complaints, which had come back normal after review by several consultants (Tr. 486), and (2) a consulting occupational medicine specialist, Allen J. Parmet, M.D., who opined that plaintiff did not meet the American College of Rheumatology diagnostic criteria for fibromyalgia in part based upon her positive responses to control points during examination (Tr. 478-79).

The medical records <u>do</u> reflect that plaintiff's treating physician had enough concerns about plaintiff's credibility that she made several entries questioning and investigating whether

65

plaintiff was engaging in drug-seeking behavior and receiving multiple prescriptions from multiple doctors and filling them at multiple pharmacies. For example, on February 6, 2001, Dr. Ahnemann conducted an investigation when plaintiff called asking for refills on Klonopin and Percocet because plaintiff had not been prescribed Percocet (a narcotic), and the doctor discovered that plaintiff was filling prescriptions at two pharmacies and thereby being given more Klonopin that she required (Tr. 326); on February 16, 2001, Dr. Ahnemann wrote a note stating, "[s]he is either abusing or selling them [Klonopin]. Either way - no more refills" (Tr. 327); on May 21, 2001, the doctor wrote "I have put her on OXYCONTIN 10 mg b.i.d. and I told her under no uncertain terms she may not increase this dose unless consulting with me first" (Tr. 331); on June 11, 2001, the doctor wrote "I discussed with her I would not refill this [Ambien and Vicoprofen, a narcotic] any sooner than a month" (Tr. 332); and on September 24, 2001, the doctor observed "patient has already picked up the 60 that was called in on Friday so she will only get 120 when she goes back to the pharmacy to pick up these [Skelaxin]" (Tr. 335).

Plaintiff's treating physician also seems to ignore the possibility that plaintiff may be experiencing some mental-health condition that could explain her complaints of constant and debilitating pain. Although plaintiff is encouraged on several occasions to seek counseling for her depression, her doctor seems

66

content to continue prescribing pain medication, including narcotics, when plaintiff ignores[32] the suggestions that she get counseling (Tr. 303; 324; 377; 416-17).

At the administrative hearings, plaintiff's explanation for her refusal to seek psychiatric help was that she had no funds to do so; yet, there is nothing in the medical records corroborating that money prevented her from receiving help. For example, on January 8, 2001, Dr. Ahnemann offered to make the appointment with Pathways for plaintiff, and plaintiff declined and indicated that she would make the appointment, which never occurred (Tr. 324). Also the record here is replete with recommendations from plaintiff's doctors that plaintiff stop smoking. If plaintiff had sufficient discretionary funds to support her smoking habit (i.e., about a pack a day) throughout this period of time as reflected by the medical records (Tr. 303; 308; 331; 397; 419), it is reasonable to infer that financial concerns were not the true reason why she did not seek mental-health treatment.

This factor does not support plaintiff's credibility.

4.    **PRECIPITATING AND AGGRAVATING FACTORS**

Plaintiff represents that weather conditions and any physical activity precipitate and aggravate her condition.

_____

[32]A failure to follow the reasonable recommendations of treating physicians is a matter that may weigh against plaintiff's credibility. <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 802 (8th Cir. 2005).

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 67 of 86

There is only one entry in the medical records (i.e., a note dated December 6, 2004) dealing with the weather and indicating that cold seems to worsen plaintiff's pain (Tr. 527-28). This lack of any contemporary entries in the medical records is surprising since plaintiff and her husband first complained about this problem to the agency on September 10, 2001, and September 16, 2001, when they respectively completed a claimant questionnaire and a daily activities questionnaire (Tr. 223; 228).

There are many entries in the records dealing with constant and debilitating pain and, again, the reliability of these complaints is suspect as discussed above.

This factor does not accrue to plaintiff's benefit.

5.   **DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION**

There are multiple entries in the medical records showing complaints about plaintiff's medications and her doctor's efforts to correct them. Generally, these complaints deal with nausea, dizziness, and the overall ineffectiveness of her pain medication. The doctor appears to have successfully resolved most of these complaints by changing the medication or adjusting the dosage. The one exception is plaintiff's complaint about unrelenting and debilitating pain all over her body for which there seems to be no solution if one were to believe plaintiff's statements. I do not. I also note here that May 12, 2004,

68

plaintiff's treating physician noted that she looked good, was not using her cane, was feeling better than she had in a long time. The only explanation for this was that plaintiff had lost her Medicaid benefits and had not filled all of her prescriptions. This leads one to speculate that the combination of plaintiff's medications should have been reevaluated and possibly reduced.

This factor does not support plaintiff's credibility.

## 6. FUNCTIONAL RESTRICTIONS

There are four residual functional capacity assessments in the record: three by plaintiff's treating physician and one by an agency's consulting physician.

The treating physician opined as follows on the dates indicated:

1. On March 9, 2001, Dr. Ahnemann noted plaintiff retained the maximum capacity to frequently lift and or carry less than ten pounds; occasionally lift and or carry less than ten pounds; stand and/or walk continuously for ten minutes; sit continuously for 15 minutes; never climb, balance, stoop, or bend; and was limited in her ability to reach, handle, finger, or feel. The doctor's assessment was for the period of October 16, 2000, to March 9, 2001. The doctor opined that plaintiff has a physical disability that would permanently prevent her from engaging in gainful activity (Tr. 443-44).

69

2.   On October 1, 2001, Dr. Ahnemann completed another medical statement on plaintiff covering the period of March 10, 2001, through October 1, 2001.  The limitations were the same as in her report dated March 9, 2001 (Tr. 445-46).

3.   On January 18, 2005, Dr. Ahnemann opined that plaintiff could lift no more than five pounds frequently; stand and/or walk continuously for one-half hour and for a total of four hours; sit continuously for one-half hour and for a total of four hours; should never climb, balance, stoop, kneel, crouch, or bend; and is limited in her ability to reach, handle, and finger objects. The doctor concluded that plaintiff's disability prevents her from engaging in employment or gainful activity for which she would be qualified by her age, training, experience, or education (Tr. 519-20).

On the other hand, the consulting agency doctor opined as follows:  On December 11, 2001, Robert E. Hughes, M.D., a consulting physician for the agency, wrote that plaintiff was alleging multiple and complex symptomatologies of pain in the musculoskeletal areas plus complaints of dizziness and lightheadedness.  He examined the record and concluded that plaintiff is capable of doing light work (Tr. 486-87).

As will be discussed below in further detail, Dr. Ahnemann's medical records do not support her assessments of plaintiff's limitations.  In fact, Dr. Ahnemann encouraged plaintiff to

70

exercise.  Because there are no significant limitations in the medical records of plaintiff's treating physicians, this factor weighs against her credibility.

B.   **CREDIBILITY CONCLUSION**

In addition to all of the above <u>Polaski</u> factors, my review of the medical records supports the ALJ's decision.  Since I have already discussed a number of plaintiff's credibility issues above, I will focus here on plaintiff's main physical complaint, i.e., fibromyalgia (Tr. 55-56; 77; 156).  It is helpful to put the entire record in chronological order when reviewing the medical and administrative entries on fibromyalgia and determining whether plaintiff is credible in her description of its existence and alleged disabling impact on her physical residual functional capacity:

On January 15, 1996, plaintiff, then age 33, went to Truman Medical Center East and complained about anxiety and depression resulting from her child-custody dispute (Tr. 302).  During this visit plaintiff represented that a "work up has been done - i.e., fibromyalgia" (Tr. 302).  There is nothing in the medical record corroborating plaintiff's statement that prior to January 15, 1996, she had been assessed as potentially suffering from fibromyalgia.  Furthermore, this 1996 date conflicts with plaintiff's other representations to the agency that she began to experience fibromyalgia sometime during the period of 1998-99

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 71 of 86

while working for the septic company.

On March 15, 2000, plaintiff went to University Hospital and Clinics in Columbia, Missouri, for an evaluation of her pain (Tr. 414). According to those doctors, plaintiff had a good range of motion in her shoulders and elbows but her movement was painful. There is a note in the record that reads: "Have seen [and] evaluated pt. She has diagnosis of fibromyalgia [unintelligible] possible sacroiliitis [and] [decreasing] Schobers" (Tr. 414-17). From this entry, I cannot tell whether the doctor is making a diagnosis or simply reporting plaintiff's representation because (1) plaintiff made a similar representation about her history of fibromyalgia to Truman Medical Center four years earlier; (2) the handwritten note referring to fibromyalgia is followed by "possible sacroiliitis [and] decreasing Schobers" which are different than fibromyalgia; and (3) there is another handwritten notation above this entry reflecting an assessment that does not include the term or abbreviation for "fibromyalgia" (Tr. 414).

On May 30, 2000, plaintiff returned to University Hospital and Clinics in Columbia for a follow-up visit (Tr. 416-17). The report shows a history of fibromyalgia (again, without the benefit of any medical records for support) and an assessment of fibromyalgia syndrome, chronic pain syndrome, and depression (Tr. 416).

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 72 of 86

On June 22, 2000, plaintiff was seen by a consulting agency doctor and reportedly could not recall any blood work or diagnostic studies being performed on her in Columbia when she was assessed with fibromyalgia syndrome (Tr. 419-22). The consulting doctor examined plaintiff and assessed diffuse myofascial pain syndrome consistent with fibromyalgia.

On October 16, 2000, plaintiff first visited Janet Ahnemann, M.D., her current treating physician, who recorded in her notes under diagnosis that "[patient] trying to get disability for her fibromyalgia" (Tr. 321). Based on her physical examination, Dr. Ahnemann diagnosed probable fibromyalgia, hypertension, migraine headaches, hiatal hernia, allergies, restless leg, and depression (Tr. 322). The doctor was sending for the records of the two rheumatologists who saw plaintiff in Columbia and Springfield (Tr. 322).

On August 8, 2001, plaintiff completed a disability report and included fibromyalgia as one of her illnesses and represented that she had pain all over, swelling in her hands and feet, memory loss, and depression - all of which have kept her from working since November 5, 1999 (Tr. 199).

On September 10, 2001, plaintiff completed a questionnaire for the agency in which she reported that her physical problems exist all the time and nothing relieves them (Tr. 223). According to plaintiff, she could do almost nothing because of

73

the pain (Tr. 224-26).

On November 26, 2001, plaintiff is examined by Allen J. Parmet, M.D., an agency's consulting doctor and specialist in occupational medicine, whose report reflects that plaintiff exhibited normal shoulder range of motion with passive testing, but moved only half as well when performing the movement independently. Plaintiff displayed a limitation in grip strength testing, which Dr. Parmet described as volitional. When asked to perform lumbar flexion, plaintiff flexed to only 45 degrees when standing. When distracted and seated, plaintiff flexed to 80 degrees, which is almost normal. Plaintiff displayed a normal gait and station, and could retrograde tandem walk without instability. This is despite the fact that she had apparently been using a cane for nearly a year. When the doctor palpated fibromyalgia tender points overtly, plaintiff had ten out of 18. When distracted, plaintiff only responded to the palpation of one point. Based on his examination, Dr. Parmet did not believe that plaintiff met the American College of Rheumatology diagnostic criteria for fibromyalgia.

On December 11, 2001, Robert E. Hughes, M.D., a consulting physician, reviewed plaintiff's medical records and observed that although plaintiff's treating physician had ordered multiple examinations in response to her complaints, those tests came back as normal after review by several consultants. The doctor

74

pointed out that plaintiff's examination in Columbia, which resulted in the fibromyalgia diagnosis, reflected that plaintiff had responded to control points as well as points that would indicate the presence of the condition. The doctor noted that the medical records contained evidence of plaintiff's drug-seeking behavior and that she had declined to follow the recommendation of her treating physician to get counseling for her depression.

In 2003, plaintiff was able to work for two quarters and earn approximately $1,800.00, despite her alleged total disability (Tr. 197). This $1,800.00 was more than she earned for 17 out of the 20 years between 1978 and 2000 when she was not disabled (Tr. 181).

On December 13, 2004, plaintiff requested that her treating physician complete the necessary paperwork so that she could become a foster parent, which the doctor refused to do because of plaintiff's health and medications. Such a request is inconsistent with plaintiff's claims of total disability. See Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). Plaintiff's desire to become a foster mother when she, according to her testimony, was so impaired that her disabled husband was doing most of the housework suggests that either plaintiff was attempting to increase her monthly income through the foster-care system knowing full well that she would be incapable of caring

75

for the child, or that she was greatly exaggerating her limitations due to her impairments.

In addition to the above observations, it is noteworthy that plaintiff had lost her Medicaid benefits in 2002 because she was making too much money as a result of her husband's Social Security benefits. It is reasonable to draw an inference from this fact that plaintiff had a strong motivation to pursue and receive disability benefits to offset this financial loss. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004).

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not credible.

## VI. CREDIBILITY OF PLAINTIFF'S TREATING PHYSICIAN

Plaintiff argues that the ALJ failed to properly consider the opinion of plaintiff's treating physician, Dr. Ahnemann. The ALJ found that plaintiff retained the residual functional capacity to perform work at the light level of exertion except that she could not work at unprotected heights or around dangerous machinery. She was limited to performing simple repetitive tasks (Tr. at 25).

Title 20, Code of Federal Regulations, Section 416.967 defines light work as follows:

> Light work involves lifting no more than 20 pounds at a time
> with frequent lifting or carrying of objects weighing up to

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 76 of 86

10 pounds.  Even though the weight lifted may be very
little, a job is in this category when it requires a good
deal of walking or standing, or when it involves sitting
most of the time with some pushing and pulling of arm or leg
controls.  To be considered capable of performing a full or
wide range of light work, you must have the ability to do
substantially all of these activities.  If someone can do
light work, we determine that he or she can also do
sedentary work, unless there are additional limiting factors
such as loss of fine dexterity or inability to sit for long
periods of time.

Plaintiff's treating physician, Dr. Ahnemann, completed

three residual physical functional capacity assessments.  In the

first two, she found that plaintiff could lift or carry less than

ten pounds; stand or walk for ten minutes at a time; sit for 15

minutes at a time; never climb, balance, stoop, or bend; and was

limited in her ability to reach, handle, finger, or feel.  She

concluded that plaintiff was permanently and totally disabled.

In the last one, dated January 18, 2005, she found that

plaintiff's lifting ability had decreased to five pounds.

However, plaintiff's ability to stand or walk increased.  Now she

was able to stand or walk for up to 30 minutes at a time, but for

only a total of four hours per day.  Plaintiff's ability to sit

also increased. Now she was able to sit for 30 minutes at a time,

again for a total of four hours per day.  She continued to be

limited in her ability to reach, handle, and finger.  She again

concluded that plaintiff was permanently and totally disabled

"from engaging in employment or gainful activity for which she

would be qualified by her age, training, experience, or

education".

A treating physician's opinion is granted controlling weight
when the opinion is not inconsistent with other substantial
evidence in the record and the opinion is well supported by
medically acceptable clinical and laboratory diagnostic
techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005);
Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ
fails to give controlling weight to the opinion of the treating
physician, then the ALJ must consider several factors to
determine how much weight to give to the opinion of the treating
physician:  (1) the length of the treatment relationship, (2)
frequency of examinations, (3) nature and extent of the treatment
relationship, (4) supportability by medical signs and laboratory
findings, (5) consistency of the opinion with the record as a
whole, and (6) specialization of the doctor.  20 C.F.R. §
404.1527(d)(2) - (5).

The ALJ thoroughly analyzed Dr. Ahnemann's medical records
and the opinions in the residual physical functional capacity
assessment:

> Janet Ahnemann, M.D., completed several medical source
> opinions. . . .  In a letter dated September 23, 2002, Dr.
> Ahnemann indicated that the claimant had fibromyalgia and
> depression.  She indicated that the claimant required a cane
> for balance and that she fell several times secondary to
> weakness, especially of the left leg. . . .
>
> . . .  Examination of the claimant by consultative
> physician, Allen J. Parment [sic], M.D., an occupational
> medicine specialist, casts some doubt on the severity of

claimant's reports of pain and limitation.  On examination the claimant abducted her shoulders to only 90 degrees, but passively she had a normal range of motion of 180 degrees. The claimant displayed a voluntary limitation of grip strength, which Dr. Parment [sic] described as volitional. The claimant flexed her lumbar spine to only 45 degrees when standing, but while distracted and sitting she was able to flex to 80 degrees. Although Dr. Ahnemann's notes reflect complaints by the claimant of pain in the hips, knees and ankles, when examined by Dr. Parment [sic] the claimant had normal range of motion of all three [types of] joints.  The claimant's gait and station were normal. The claimant was able to retrograde tandem walk without instability.  It is significant to note that when fibromyalgia tender points were palpated the claimant had several tender points in the neck, elbow, and knee giving her a score of 10/18; however, when she was distracted, she responded to only one of these tender points. . . .

Ordinarily the opinion of a treating source such as Dr. Ahnemann, is normally entitled to great weight as a matter of regulatory law.  However, controlling weight is not automatically given to a treating source's opinion. . . . The undersigned does not give controlling weight to the opinion of Dr. Ahnemann for several reasons.

Even though Dr. Ahnemann has treated the claimant for a significant period of time, nonetheless, she is a general practitioner, not a specialist in the diagnosis and treatment of fibromyalgia, the primary impairment upon which her assessment is based.  The limitations set forth by Dr. Ahnemann are rather severe, but these restrictions appear only in documents which were apparently prepared at the request of the claimant's attorney.  Three of these statements were in the form of check-off forms.  There is no indication in the normal treatment notes of Dr. Ahnemann that she told the claimant that similar restrictions were imposed upon her in the performance of either work or activities of daily living.  No other physician who has examined the claimant has imposed similarly severe limitations.  This is a conflict that the undersigned needs to resolve. The undersigned appropriately resolves this conflict by giving greater weight to the treatment notes rather than the form solicited by the claimant's attorney because the treatment notes were prepared in the course of actual medical treatment for the purpose of medical treatment, so they are inherently more reliable.  The limitations set forth in Exhibits B13F and B27F are not

79

supported by the medical and other evidence of record
because these contain mainly a recitation of the various
subjective complaints of the claimant, and because Dr.
Ahnemann cited little or no positive clinical signs to
support those limitations.  The limitations cited in the
medical source statement are also inconsistent with the
claimant's activities of daily living.  Particularly
noteworthy is the fact that the claimant on December 13,
2004, asked Dr. Ahnemann to sign a form to certify her
suitability to become a foster parent.  In so doing the
claimant expressed her own belief that she was capable of
caring for children, which is totally inconsistent with her
allegations of disability and the symptoms and limitations
she has alleged to Dr. Ahnemann. . . .  Dr. Ahnemann
directed the claimant to walk and do exercises, which is not
consistent with the degree of limitation she set forth in
the various medical source statements.

Although other physicians have agreed with Dr. Ahnemann's
diagnosis of fibromyalgia, clinical findings by them were
relatively minor.  The claimant was examined by Eric L.
Greidinger, M.D., a specialist in rheumatology . . . in May
2000.  At that time the claimant reported that she hurt all
over her body and could not pin point a joint or area where
she was hurting, and she denied any joint swelling.  On
examination she had good range of motion of the upper and
lower extremities and there was no synovitis, joint
swelling, or tenderness noted.  Although the claimant did
have tender points of fibromyalgia, she also had control
points like the arms and legs that were also tender . . .

Although Dr. Ahnemann indicated that her treatment notes
reflected multiple trigger points were present on March 7,
2002, this result comes under question in light of the
examination results by Dr. Parment [sic] when the claimant
reported only one of 10 previously identified positive
trigger points when she was distracted. As previously
indicated there were other inconsistencies also present
during Dr. Parment's [sic] examination.  Dr. Ahnemann's
treatment notes are rather sparse in findings concerning the
presence of trigger points, much less their number and
location.  Although the claimant from time to time
complained of muscle spasms, there are no instances in which
Dr. Ahnemann indicated that she observed or palpated spasms.
Consequently greater weight must be given to Dr. Parment's
[sic] findings than Dr. Ahnemann's.

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 80 of 86

Although the claimant reported to Dr. Ahnemann that she frequently falls, and at one point the doctor attributed the falls to fibromyalgia, falling is not a usually recognized fibromyalgia symptom. There is little evidence that the claimant sought emergency room care due to any fall. There is no medical evidence of any disorder imaging results either musculoskeletal, cardiovascular or otherwise, that would account for the alleged falling spells. X-rays of the claimant's knees are essentially negative. . . .

The limitations Dr. Ahnemann indicated on the check-off medical source statements prepared for the claimant's attorney are not consistent with the claimant's admitted activities of daily living. According to the claimant's own testimony she worked part time during the period she alleges she was disabled. It is significant to note that while the claimant's husband is disabled and that claimant alleges disability, she told Dr. Ahnemann that she was interested in becoming a foster parent and requested support from the doctor in this endeavor. . . .

Although some weight is given to Dr. Ahnemann's medical source statements, when considered as a whole the evidence provides greater support for the opinion of Dr. Parment [sic] that the claimant is limited to the light level of exertion. Even this assessment gives the claimant some benefit of the doubt as Dr. Parment [sic] attributed the claimant's limitations to deconditioning.

(Tr. at 22-25).

(1) Length of the treatment relationship. The ALJ acknowledged that Dr. Ahnemann has treated plaintiff for a significant period of time (Tr. at 23).

(2) Frequency of examinations. The ALJ did not specifically find that Dr. Ahnemann saw plaintiff frequently; however, his reference to plaintiff having seen Dr. Ahnemann for a "significant period of time" and the record itself supports a finding that plaintiff frequently saw Dr. Ahnemann.

81

(3) Nature and extent of the treatment relationship. There is no question that plaintiff saw Dr. Ahnemann for fibromyalgia, which is the main impairment she claims causes her disability.

(4) Supportability by medical signs and laboratory findings. The ALJ discussed this factor at length in his opinion. He noted that:

a)   the limitations set forth in the RFC assessments are not supported by Dr. Ahnemann's medical records or any other evidence in the record because they contain nothing more than a recitation of plaintiff's subjective complaints and because Dr. Ahnemann cited little or no positive clinical signs to support the limitations.

b)   Although other physicians have agreed with Dr. Ahnemann's diagnosis of fibromyalgia, clinical findings by those doctors were relatively minor.

c)   When seen by a rheumatologist, plaintiff had good range of motion of the upper and lower extremities, there was no synovitis, joint swelling, or tenderness noted. Although plaintiff did have tender points of fibromyalgia, she also had control points that she claimed were also tender.

d)   Dr. Ahnemann noted in her treatment notes on March 7, 2002, that plaintiff had multiple trigger points, but "this result comes into question" in light of the

82

examination by Dr. Parmet when plaintiff had only one of ten previously-identified trigger points when she was distracted.

e) Dr. Ahnemann's treatment notes are "rather sparse in findings" concerning the presence of trigger points much less their number and location.

f) There are no instances in which Dr. Ahnemann indicated that she observed or palpated spasms, despite plaintiff's complaint of muscle spasms.

g) X-rays of plaintiff's knees were essentially normal.

(5) Consistency of the opinion with the record as a whole. Again, the ALJ discussed this factor at length in his opinion. He noted that:

a) Plaintiff was examined by occupational medicine specialist Allen Parmet, M.D., who found plaintiff could only actively abduct her shoulders to 90 degrees but passively she had a normal range of motion of 180 degrees. Plaintiff displayed a voluntary limitation of grip strength which was volitional.

b) The restrictions listed by Dr. Ahnemann in the RFC assessments appear only in check-off documents prepared for plaintiff's attorney, not in any of her treatment notes.

Case 2:07-cv-04143-REL   Document 15   Filed 09/26/08   Page 83 of 86

c) No other physician who has examined plaintiff has imposed similarly severe limitations.

d) Treatment notes are prepared in the course of actual medical treatment and are therefore inherently more reliable than the RFC assessments prepared for a non-medical reason.

e) The restrictions in the RFC assessments are inconsistent with plaintiff's activities of daily living, particularly her desire to become a foster parent.

f) Dr. Ahnemann directed plaintiff to walk and do exercises, which is inconsistent with the degree of limitation she set forth in the RFC assessments.

g) The limitations in the RFC assessments are inconsistent with plaintiff's ability to work part time (and not in a sedentary job) for several months, even without performing all of the duties required in that job.

(6) Specialization of the doctor. Plaintiff points out that the ALJ discredited Dr. Ahnemann merely because she is a general practitioner and not a specialist. According to the regulations, the ALJ is required to take this difference into consideration. Supporting the ALJ's observation of this fact is Dr. Ahnemann's attributing plaintiff's falling to fibromyalgia when falling is not a typical symptom of fibromyalgia and plaintiff's knee x-rays were essentially normal. This, coupled with the fact that Dr.

84

Ahnemann's opinion differed markedly from the opinion of a rheumatologist, makes this factor significant.

I find that the ALJ adequately supported his decision to discredit the opinion of Dr. Ahnemann in the residual functional capacity assessments in favor of the opinions of the specialist and the limitations set out in Dr. Ahnemann's treatment notes. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

### VII. QUESTIONING OF THE VOCATIONAL EXPERT

Plaintiff complains that the ALJ's hypothetical question to the vocational expert did not include all her impairments.

An ALJ need only include in his or her hypothetical those impairments and limitations that are credible. Pertuis v. Apfel, 152 F.3d 1006, 1007 (8th Cir. 1998).

It was proper for the ALJ here to exclude the plaintiff's allegations of unrelenting and disabling pain because they were not credible based on his review of the record. It was similarly proper for the ALJ to discount the opinion of plaintiff's treating physician, Dr. Ahnemann, for the reasons set forth above. Therefore, I find no error in the ALJ's construction of the hypothetical question posed to the vocational expert because it was based on his analysis of the credible evidence.

85

## VIII. CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_____/s/ Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 26, 2008